WESTFIELD COMPANIES, Appellee and Cross–Appellant,

v.

O.K.L. CAN LINE, Appellant and Cross–Appellee;
Alcoa Packaging Machinery, Inc., Defendant.

[Cite as *Westfield Cos. v. O.K.L. Can Line*, 155 Ohio App.3d 747, 2003-Ohio-7151.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–030151, C–030197 and C–030298.

Decided Dec. 30, 2003.

748

Davis & Young and Dennis Fogarty; McCaslin, Imbus & McCaslin and Gary Winters, for appellee and cross-appellant.

Dinsmore & Shohl, LLP, James D. Liles, Jeffery R. Schaefer and Richard D. Porotsky Jr., for appellant and cross-appellee.

MARK P. PAINTER, Judge.

{¶ 1} This appeal and cross-appeal involve an "advertising injury" insurance-coverage dispute between O.K.L. Can Line ("OKL") and its insurer, Westfield Companies. The parties have had an ongoing dispute for more than three years, the legal entanglements of which are difficult to fathom. But the real issues are whether a dispute between OKL and Alcoa was covered by OKL's insurance policy issued by Westfield, and whether Westfield had a duty to defend.

{¶ 2} OKL manufactures component parts for aluminum can-making machines, including a fluid bearing ram ("FBR") assembly. In January 2000, Alcoa sued OKL for trade dress and patent infringement in connection with the FBR assembly. The complaint did not contain the dates of the alleged infringement. OKL tendered the defense to Westfield. After rejecting the tender based upon an old and inapplicable 1994–1995 policy, Westfield filed a declaratory-judgment

action. In response, OKL filed two counterclaims. First, OKL alleged that Westfield had breached the terms of its 1999–2000 insurance policy and umbrella endorsement. Second, OKL alleged that Westfield's conduct amounted to a bad-faith failure to defend. Subsequently, OKL settled the Alcoa action.

{¶ 3} The trial court granted partial summary judgment to OKL on the breach-of-contract claim, holding that Westfield had a duty to defend under the 1999–2000 policy. The court awarded OKL the attorney fees incurred in settling the Alcoa dispute, as well as those incurred in defending against Westfield's declaratory-judgment action. The case then proceeded to a jury trial in which OKL pursued the bad-faith claim and sought additional damages for the breach of the duty to defend. OKL argued that, as a result of Westfield's failure to defend against Alcoa's unfounded claims, it was forced into an unfavorable settlement costing the company more than $1 million. The jury rejected OKL's arguments and found in favor of Westfield on all issues. Both sides have appealed.

## I. Summary Judgment

{¶ 4} In its first assignment of error in the cross-appeal, Westfield argues that the trial court erred in granting summary judgment to OKL on its counterclaim for breach of the duty-to-defend claim and in denying summary judgment to Westfield on both counterclaims. According to Westfield, this case should have ended with summary judgment in its favor because the Alcoa complaint alleged a basic trade-dress-infringement claim, and not an advertising-injury claim based upon trade-dress infringement. The 1999–2000 policy did not contain coverage for basic trade-dress-infringement claims, but it did contain coverage for an advertising-injury claim. Westfield argues also that in making a determination on the duty to defend, the trial court should have looked to the facts revealed in discovery, and not to the scope of the allegations made in the complaint. We reject Westfield's arguments.

## II. Trade–Dress Infringement

{¶ 5} "Trade dress" is a term referring to the "total image or overall appearance of a product, including size, shape, color, texture, and graphics."[1] Trade dress can serve as an identifier of product origin.[2] Trade dress can refer to such things as the overall appearance of labels or wrappers used in packing a product, the distinctive décor, menu and style of a restaurant, and the shape and design of

---

1. See AM Gen. Corp. v. DaimlerChrysler Corp. (C.A.7, 2002), 311 F.3d 796, 814 (internal quotations omitted).

2. See 1 McCarthy, Trademarks and Unfair Competition (4th Ed.2003) 8–2 to 8–3, Section 8:1.

the product itself.[3] In this case, Alcoa alleged trade-dress protection in the "overall configuration of Alcoa's ribbed swept-box shaped liquid bearing ram supports." Alcoa claimed that OKL's FBR assembly had "identical distinctive features and similar overall configuration," illegally copied from Alcoa's product, and that OKL's infringement had resulted in "actual confusion or a likelihood of confusion among members of the purchasing public as to the origin" of OKL's FBR assembly. Alcoa sued under Section 43(a) of the Lanham Act[4] and further asserted the common-law tort of unfair competition.

### III. The Advertising–Injury Provisions

{¶ 6} Courts, insurers, and insureds have struggled with the interpretation of "advertising injury" coverage provisions in commercial insurance policies.[5] The Insurance Services Office, an organization responsible for drafting the standard-form commercial general liability policy, has revised the "advertising injury" section of the policy several times in the past three decades.[6] The 1999–2000 policy at issue in this case contains the Insurance Service Office's 1998 revisions.

{¶ 7} The "advertising injury" provision of the insurance contract at issue in this case provided, "This insurance applies to 'personal and advertising' injury caused by an offense arising out of your business * * *." " 'Personal and advertising injury' means injury, including consequential 'bodily injury', [sic] arising out of one or more of the following offenses: * * * [I]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.' * * * 'Advertisement' means a notice that is broadcasted or published to the general public or specific market segment about your goods, products or services for the purposes of attracting customers or supporters."

### IV. The Duty to Defend

{¶ 8} Under Ohio law, the scope of the allegations in the complaint determines whether an insurance company has a duty to defend the insured.[7] If the complaint contains allegations bringing the action within a coverage provision, the insurer is required to make a defense, regardless of the ultimate outcome of

---

3. Id.

4. Section 1125(a), Title 15, U.S.Code.

5. See Annotation, Advertising Injury Insurance (2002), 98 A.L.R.5th 1.

6. See 5 McCarthy, Trademarks & Unfair Competition (4th Ed.2003) 33–8 to 33–11, Section 33:5.

7. See *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 62 O.O.2d 402, 294 N.E.2d 874.

the action or the insurer's liability to the insured.[8] Where the insurer's duty is not clear from the complaint, but the allegations do state a claim that is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept defense of the claim.[9] In accepting such a defense, the insurer is free to reserve its rights to assert defenses that later come to light.[10] Conversely, if the conduct alleged in a complaint is indisputably outside the scope of coverage, there is no duty to defend.[11]

{¶ 9} In interpreting an insurance contract, a court must give effect to the parties' intentions.[12] We use the plain and ordinary meaning of the language in the policy unless another meaning is clearly apparent from the contents of the policy.[13] Generally, if a policy is capable of more than one reasonable interpretation, it will be construed strictly against the insurer and liberally in favor of the insured.[14]

## V. Standard of Review

{¶ 10} We review the entry of summary judgment de novo.[15] Where a trial court applies incorrect law but the decision is ultimately correct, the decision will be affirmed.[16] In this case, the trial court held that the trade-dress-infringement allegations in the Alcoa complaint triggered Westfield's duty to defend under the advertising-injury provision of the insurance contract. In coming to this conclusion, the court erroneously held that the duty to defend was triggered because the complaint alleged trade-dress infringement and trade-dress infringement *inherently* involved advertising.

---

**8.** Id. at paragraph two of the syllabus.

**9.** See *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 180, 9 OBR 463, 459 N.E.2d 555.

**10.** Id.

**11.** See *Cincinnati Ins. Co. v. Anders*, 99 Ohio St.3d 156, 2003-Ohio-3048, 789 N.E.2d 1094, ¶ 51.

**12.** See *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

**13.** See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus.

**14.** See *Andersen v. Highland House Co.* (2001), 93 Ohio St.3d 547, 549, 757 N.E.2d 329.

**15.** See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243.

**16.** See *Este Oils Co. v. Federated Ins. Co.* (1999), 132 Ohio App.3d 194, 198, 724 N.E.2d 854.

{¶ 11} We may agree in principle with the trial court and other courts that have held that trade dress inherently involves advertising where, as here, the overall configuration of the product is alleged as trade dress. The design of a product identifies the source and advertises the source to all who see it. But this abstract concept of intellectual property law does not govern whether the allegations in the Alcoa complaint potentially fell under the "personal and advertising injury" provisions of the insurance contract.

### VI. Advertising or Not

{¶ 12} To determine whether the allegations in the Alcoa complaint gave rise to potential coverage under the Westfield policy, we apply a four-part test. We must determine whether the Alcoa complaint (1) stated a claim covered under the advertising-injury provisions of the insurance policy; (2) alleged that OKL engaged in "advertisement" as defined in the policy; and (3) alleged a causal connection between the injury and OKL's "advertisement."[17] If the first three conditions were met, we must determine whether any exclusions applied. Applying this test, we hold that Alcoa asserted claims that potentially fell under the coverage provisions of the policy, triggering the duty to defend. Westfield's first assignment of error is overruled.

{¶ 13} In determining whether Alcoa stated a claim triggering the duty to defend under the insurance policy, we look at the allegations in the complaint. Alcoa alleged that OKL "infringed its trade dress," a specifically enumerated, covered offense under the advertising-injury provisions of the policy. Alcoa defined the trade dress at issue as the "overall configuration of Alcoa's ribbed swept-box shaped liquid bearing ram support." In light of this language, we hold that the complaint alleged "infringement of trade dress" and met the first prong of the test.

{¶ 14} The second prong was also satisfied. In framing its allegations against OKL, Alcoa did not use the words "advertisement" or "advertising." But Alcoa did state that OKL "sold and marketed" the product and confused "buyers and potential buyers." These allegations arguably met the definition of "advertisement" in the policy—"a notice that is broadcasted or published to the general public or specific market segment about your goods, products or services for the purposes of attracting customers or supporters." Webster's Third New International Dictionary defines "marketing" as "an aggregate of functions involved in transferring title and in moving goods from producer to consumer * * *."[18]

---

17. See *Fireman's Fund Ins. Co. v. Bradley Corp.* (2003), 261 Wis.2d 4, 22, 660 N.W.2d 666.

18. Webster's Third New International Dictionary, Unabridged (1993) 1383.

{¶ 15} The court in *Poof Toy Products, Inc. v. Unites States Fidelity & Guaranty Co.* held that the term "marketing" encompassed advertising activity where "advertising activity" was defined as "the action of calling something (as a commodity for sale, a service offered or desired) to the attention of the public, especially by means of printed or broadcast paid announcements."[19] The *Poof Toy* court additionally held that allegations of trade-dress infringement inherently involved advertising activity because there could be no trade-dress infringement without advertising having occurred.[20] In coming to this conclusion, the court stated that "a required element in every trademark/trade dress case [is] that the mark or dress is likely to cause confusion to the consumer or deceive the consumer as to the origin or manufacturer of the goods.[21] * * * To have (or potentially cause) this effect, one must clearly advertise (announce to the intended customers) the mark or dress."[22] (Footnotes added.)

{¶ 16} We agree with the underlying legal principle espoused by the *Poof Toy* court—that trade-dress infringement necessarily involves advertising. But this principle does not resolve this case because "advertisement" was specifically defined in the Westfield policy. In the policy's words, the injury had to arise out of "a notice that is broadcasted or published to the general public or specific market segment about your goods, products or services for the purposes of attracting customers or supporters." This definition was broad, but it required more than just stating that the infringer's use of another's trade dress was likely to cause confusion to the consumer or to deceive the consumer as to the origin or manufacturer of the goods. Also required was a "notice" intended to attract customers.[23]

{¶ 17} To support our conclusion that Alcoa was alleging an advertising injury, we note that OKL attached to its summary-judgment motion printed web pages from OKL's web site depicting for sale the allegedly infringing product. The web pages were dated May 2000. A web page is advertising under any definition. We are satisfied that the wording of the complaint and the actual existence of a public ad for the product indicated a possibility that Alcoa was alleging that OKL had engaged in "advertisement" as defined in the policy.

---

19. (E.D.Mich.1995), 891 F.Supp. 1228, 1235.

20. Id. at 1235–1236.

21. See Section 1125(a), Title 15, U.S.Code.

22. Id. at 1236.

23. See *Cent. Mut. Ins. Co. v. StunFence, Inc.* (N.D.Ill.2003), 292 F.Supp.2d 1072.

{¶ 18} Our analysis of the third prong is more difficult. We must focus on whether Alcoa alleged a sufficient causal connection between its injuries and OKL's advertising activities. Westfield argues that Alcoa's injuries derived from the infringement, and not from the advertisement of the infringing product. Some courts have held in insurance disputes such as this one that the cause of an alleged trade-dress advertising injury is the initial copying of the trade dress, not the subsequent advertising that depicts the copied trade dress.[24] If we were to apply this rule, the advertising-injury coverage with respect to trade dress would be illusory—the insured would always be foreclosed from meeting the causation requirement. Surely this was not the intent of the parties. The language of the insurance contract required only that the " 'advertising injury' [be] caused by an offense arising out of your business * * * and that the 'advertising injury' aris[e] out of * * * infringing upon another's copyright, trade dress or slogan in your 'advertisement.' "

{¶ 19} Both the Second Circuit Court of Appeals[25] and the Third Circuit Court of Appeals[26] have interpreted the "arising out of" language as requiring the advertising to materially contribute to the injury of creating consumer confusion. But the advertisement does not need to be the only cause of the injury to trigger the duty to defend.[27] Ohio courts have interpreted the "arising out of" language more broadly.[28] The phrase has been defined to mean "flowing from," "having its origin in" or "growing out of." The phrase indicates a requirement of a causal relationship but not one of proximate cause.[29] We apply the broad definition under Ohio insurance law, and, in doing so, we conclude that the requisite causal relationship was alleged in the complaint.

{¶ 20} In paragraph 13 of the complaint, Alcoa alleged that "[t]he retrofit and remanufactured liquid bearing ram supports marketed and sold by OKL * * * are not marked with any OKL insignia or other marking OKL as the source of the products. The OKL liquid bearing ram supports are confusingly similar in appearance, shape and design to the liquid bearing ram support marketed by Alcoa both in its can bodymaking machinery, and also in its retrofit and remanufactured product lines * * *."

---

24. See *Advance Watch Co. v. Kemper Natl. Ins. Co.* (C.A.6, 1996), 99 F.3d 795, 806–807.

25. See *R.C. Bigelow v. Liberty Mut. Ins. Co.* (C.A.2, 2002), 287 F.3d 242, 248.

26. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.* (C.A.3, 1999), 193 F.3d 742, 750, fn. 8.

27. *Bigelow,* 287 F.3d at 248–249.

28. See *Stickovich v. Cleveland* (2001), 143 Ohio App.3d 13, 37, 757 N.E.2d 50.

29. Id. (internal citations omitted).

{¶ 21} After incorporating the allegations of paragraph 13 into its Lanham Act claim, Alcoa continued by stating that "OKL intentionally and illegally copied the distinctive features and configuration of Alcoa's liquid bearing ram support, and [a]s a result of OKL's * * * wrongful acts, Alcoa has been damaged by loss of sales, revenues, and profits, and loss of business reputation and diminished goodwill among the purchasers and potential purchasers of OKL retrofit and remanufactured liquid bearing ram supports who erroneously associate such liquid bearing ram supports with Alcoa. In addition, Alcoa has been irreparably damaged by the diminished distinctiveness of its retrofit and remanufactured liquid bearing ram support."

{¶ 22} The gist of these allegations was that OKL's infringing product created consumer confusion and that this confusion flowed from OKL's marketing of the infringing product to purchasers and potential purchasers. Therefore, the third prong of the test was satisfied.

### VII. Exclusions

{¶ 23} We have determined that Alcoa's trade-dress-infringement claim potentially fell within the insurance agreement for "advertising injury." Now we must determine whether the allegations in the complaint implicated any exclusion in the insurance policy and barred coverage.

### VIII. "Intentional, Knowing, and Illegal Conduct" Exclusion

 {¶ 24} This provision excluded coverage for "personal and advertising injury" that was the result of an insured's intentional, knowing and illegal conduct. The exclusion provided, "This insurance does not apply to: (a) 'Personal and advertising injury': 1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising' injury." Westfield argued below that this exclusion applied because the Alcoa complaint contained allegations of intentional infringement. But we hold that the exclusion did not apply because the complaint stated a claim for nonintentional infringement as well. Alcoa could have prevailed on the Lanham Act or the common-law trade-dress-infringement claim without proving intentional or knowing infringement.[30] Proof of intent is required only to justify a request for enhanced damages and attorney fees.[31] The exclusion, therefore, did not apply under the facts of this case.

---

**30.** See *Syndicate Sales, Inc. v. Hampshire Paper Corp.* (C.A.7, 1999), 192 F.3d 633; Restatement of the Law 3d, Unfair Competition (2003), Sections 1–5.

**31.** See *Chanel, Inc. v. Italian Activewear of Florida, Inc.* (C.A.11, 1991), 931 F.2d 1472, 1475–1476, and fn. 4.

## IX. "Prior Publication" or "Prior Acts" Exclusion

{¶ 25} Advertising injury "arising out of *oral or written publication of material* whose first publication took place before the beginning of the policy period" was also excluded under the insurance contract. (Emphasis added.) We hold that this exclusion did not preclude coverage for two reasons. First, the Alcoa complaint did not specify when OKL began marketing the allegedly infringing product, so we are unable to determine whether this date was prior to May 1999, the date the policy became effective.

{¶ 26} Second, we hold that this exclusion applied only to advertising injuries based upon libel, slander, disparagement, and invasion of privacy. Under Ohio law, "an exclusion in an insurance policy will be interpreted as applying only to that which is *clearly* intended to be excluded." [32] The language of the exclusion quoted above mimicked the language of the libel, slander, disparagement, and invasion-of-privacy coverage provisions. The insurance policy provided that " '[p]ersonal and advertising injury' means injury, including consequential 'bodily injury', arising out of one or more of the following offenses: * * * d.) *[o]ral or written publication of material* that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; e.) *[o]ral or written publication of material* that violates a person's right to privacy." (Emphasis added.) Given this duplicate language, we hold that this exclusion applied only to provisions other than those concerning the offense of trade-dress infringement. [33]

## X. Damages for the Breach of the Duty to Defend

{¶ 27} After finding a duty to defend, the trial court awarded OKL attorney fees of $54,226.02 incurred in the underlying Alcoa action and an additional $71,941.50 incurred in the defense of the declaratory-judgment action and in litigating OKL's counterclaim for breach of contract. On appeal, Westfield argues in its second assignment of error that the latter award violated Ohio law. We disagree and overrule the assignment of error.

{¶ 28} Ohio follows the "American Rule," which generally requires that an award of "costs" in the form of attorney fees to a prevailing party in a civil action or proceeding must be based upon an express authorization of the General Assembly or upon a finding that the losing party has acted in "bad faith,

---

32. See *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (emphasis in original).

33. See *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.* (S.D.Fla.2001), 165 F.Supp.2d 1332, 1342.

vexatiously, wantonly, obdurately, or for oppressive reasons." [34] But attorney fees are allowable as "damages" in breach-of-contract cases where the parties have bargained for this result and the breaching party's wrongful conduct has led to the legal fees being incurred.[35]

{¶ 29} The trial court properly in this case awarded to OKL as "damages" the legal fees incurred in defending the Alcoa action. The insurance policy supported the award because Westfield contractually accepted the duty to defend OKL against third-party lawsuits to which coverage potentially applied.

{¶ 30} But the parties here did not contract to shift fees incurred for litigation of the dispute between insured and insurer. The trial court awarded these fees to OKL as "costs," so the award had to be authorized by legislation or by a finding that Westfield had acted in "bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons."

{¶ 31} This dispute implicated Ohio's Declaratory Judgment Act,[36] because both parties asked the court to declare the rights and duties of the parties under the contract. R.C. 2721.16 specifically prohibits the award of attorney fees on a claim for declaratory relief unless another source of law explicitly provides for the award. This statute was enacted in 1999 specifically to supersede the effect of the Ohio Supreme Court's holdings in a line of cases beginning in 1995 with *Motorists Mut. Ins. Co. v. Brandenburg.*[37] The legislature expressly overturned the holding in *Brandenburg* "that the 'whenever necessary or proper' and 'further relief' language in section 2721.09 of the Revised Code * * * reflected the General Assembly's conferral of authority upon an Ohio trial court to award 'attorney's fees based on a declaratory judgment issued by the court,'" and emphasized, "consistent with the 'American Rule,' that authority to grant an award of attorney's fees in connection with an action or proceeding in which declaratory relief is sought * * * must be expressly conferred by the General Assembly upon the courts of this state and has not been so conferred prior to the effective date of this act." [38]

---

**34.** *Sorin v. Warrensville Hts. Bd. of Edn.* (1976), 46 Ohio St.2d 177, 179–181, 75 O.O.2d 224, 347 N.E.2d 527.

**35.** See *Socony–Vacuum Oil Co. v. Continental Cas. Co.* (1945), 144 Ohio St. 382, 29 O.O. 563, 59 N.E.2d 199.

**36.** R.C. Chapter 2721.

**37.** (1995), 72 Ohio St.3d 157, 648 N.E.2d 488.

**38.** See H.B. 58, Section 3, 148 Ohio Laws, reprinted in Page's Ohio Rev.Code Ann. (2000).

{¶ 32} In this case, the trial court, citing a line of pre–1999 case law, beginning with *Motorists Mut. Ins. Co. v. Trainor*,[39] stated that OKL was automatically entitled to recover the attorney fees and costs incurred in forcing Westfield to honor its duty to defend OKL. Mindful of the legislature's 1999 modification to the Declaratory Judgment Act, the trial court held that the award of fees in *Trainor* was based upon a different rationale than that used by the *Brandenburg* court, and, therefore, that *Trainor* was still good law.

{¶ 33} In *Trainor*, the insurance company rejected the Trainors' request for a defense of a negligence action. Instead of providing a defense as required under the contract, the insurer notified the Trainors that, if they agreed to a reservation of rights, counsel would be assigned to provide the requested defense. The Trainors did not respond to the request. After a default in pleading was entered against the Trainors in the negligence action, they again demanded a defense and threatened to sue Motorists. Private counsel retained by the Trainors undertook defense of the negligence action. Several months later, Motorists filed a declaratory-judgment action against the Trainors, indicating a new willingness to defend if the court would declare that, by providing such a defense, Motorists was not waiving its rights to contest the question of actual coverage for the claim under the Trainors' policy. In their answer, the Trainors cross-petitioned for attorney fees expended to date in the negligence action and in the declaratory-judgment action. The Ohio Supreme Court affirmed the trial court's award of those fees. In doing so, the court noted the general rule denying attorney fees in a breach-of-contract action and an exception to this rule where an insurer wrongfully refuses to defend an action against its insured.[40] As noted by the *Trainor* court, this exception had been invoked by the court in *Socony–Vacuum Oil Co. v. Continental Cas. Co.*[41] to award fees the insured incurred in defending the underlying action.

{¶ 34} The *Trainor* court extended the *Socony–Vacuum* exception to allow an award of fees in the declaratory-judgment action as well. The court noted that "[t]he rationale behind allowing attorney fees to date in defending the negligence action is that the insured must be put in a position as good as that which he would have occupied if the insurer had performed its duty. The fact that the insurer brings a declaratory judgment action after it has failed in its duty to defend should not require the insured to incur expenses which he cannot recover." [42]

---

39. (1973), 33 Ohio St.2d 41, 46–47, 62 O.O.2d 402, 294 N.E.2d 874.

40. Id. at 46, 62 O.O.2d 402, 294 N.E.2d 874.

41. (1945), 144 Ohio St. 382, 29 O.O. 563, 59 N.E.2d 199.

42. *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 47, 62 O.O.2d 402, 294 N.E.2d 874.

{¶ 35} In support of this extension, the *Trainor* case cited three cases from other jurisdictions. None applied Ohio law. The court in the first case, *National Indemn. Co. v. Harper*,[43] allowed an award of fees incurred in the defense of a declaratory-judgment action under the federal Declaratory Judgment Act, which allowed the court to "grant further" or "necessary relief." The Ohio Declaratory Judgment Act contains similar language in R.C. 2721.09, but the newly enacted R.C. 2721.16 expressly rejects such an interpretation.

{¶ 36} The *Trainor* court also cited *Johnson v. General Mut. Ins. Co.*[44] in support of an extension. The *Johnson* court, applying New York law, held that where an insurer breaches the duty to defend, an award of attorney fees must be limited to the expenses incurred in defending the underlying action, and not extended to the expenses incurred in litigating the coverage action.

{¶ 37} Finally, the *Trainor* court cited the federal court's decision in *Southwestern Bell Tel. Co. v. Western Cas. & Sur. Co.*[45] The *Southwestern Bell* court allowed an award of attorney fees incurred in a coverage dispute. It relied upon a Virginia statute authorizing an award of attorney fees if the insurance company had "vexatiously" refused to pay a loss. The Ohio legislature has not passed a similar provision. But a "well-settled rule of law" followed by Ohio courts provides an exception to the "American Rule" "as part of relief granted a petitioner in actions where the losing party has acted in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons."[46] We hold that *Trainor* supports an award of fees under this rationale. Subsequent cases relying on *Trainor* for an award of attorney fees in a declaratory judgment/breach of contract action are only good law to the extent that they conform to this holding.

{¶ 38} But the trial court's reliance on *Trainor* was not completely misplaced. It awarded fees on an alternative basis—Westfield's "stubborn propensity for needless litigation." As examples of this obdurate behavior, the court cited Westfield's filing of a declaratory-judgment action under an old insurance policy not at issue, using a reversed case as legal authority for an argument before the court, and blaming OKL for its confusion. We will not reverse the trial court's finding absent an abuse of discretion. Finding no abuse of discretion, we affirm the award of attorney fees.

---

43. (D.C.Mo.1969), 295 F.Supp. 749.

44. (1967), 28 A.D.2d 945, 281 N.Y.S.2d 612.

45. (D.C.Mo.1967), 269 F.Supp. 315.

46. *Sorin*, 46 Ohio St.2d at 181, 75 O.O.2d 224, 347 N.E.2d 527.

{¶ 39} We note parenthetically that, although obdurate behavior is often thought of as akin to "bad faith," our holding does not mean that OKL proved a "bad faith claim" against its insurer. Different issues are involved in such a claim. Importantly, in deciding a bad-faith claim, the fact finder must decide whether there was an *actual* duty to defend under the policy. Conversely, the issue decided here is whether there was *potential* coverage under the policy.

{¶ 40} In sum, we uphold the trial court's grant of partial summary judgment to OKL. We hold that the trial court did not err in finding that the Alcoa complaint alleged claims potentially falling under the advertising-injury portion of OKL's insurance policy. In failing to defend, Westfield breached its duty under the insurance contract, warranting an award of attorney fees incurred in litigating the Alcoa lawsuit. In "acting with a stubborn propensity for needless litigation," Westfield was also properly ordered to pay the attorney fees OKL incurred in establishing the breach.

## XI. Amendment and Supplementation of the Pleadings

{¶ 41} After prevailing on the partial motion for summary judgment based upon the 1999–2000 insurance policy, OKL moved for leave to amend and supplement its counterclaims. Having settled with Alcoa since filing the initial counterclaim, OKL sought to add a counterclaim for indemnification and a counterclaim for unjust enrichment based on Westfield's saving of defense costs. OKL also requested leave to include counterclaims under policies dating back to 1996–1997, since Westfield had begun to claim that prior policy periods were implicated.

{¶ 42} At the time OKL moved for leave to amend, no trial date had been set and discovery was just beginning. Westfield did not object to the proposed amendments, but the trial court refused to grant leave, stating that it believed that it made the case "more confusing." On appeal, in its second assignment of error, OKL argues that the court's denial of leave to amend and supplement was erroneous. We agree and sustain the assignment of error.

{¶ 43} Leave of court to amend or supplement a pleading should be freely given.[47] We hold that the trial court abused its discretion in denying such leave where the request was tendered in a timely fashion and in good faith, and when the amended and supplemented claims may have entitled OKL to relief.[48] On remand, OKL must be permitted to amend and supplement its counterclaims.

47. Civ.R. 15(A).

48. See *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 63 O.O.2d 262, 297 N.E.2d 113.

## *XII. Trial Issues*

{¶ 44} The parties asked the jury to decide whether Westfield's breach of its duty to defend had proximately caused damages or loss to OKL and whether Westfield had acted with reasonable justification when it refused to defend OKL. Damages for breach of the duty to defend should have been limited to those damages that could reasonably have been considered as arising naturally from Westfield's breach of the duty to defend.[49]

## *XIII. OKL's Additional Damages from the Breach of the Duty to Defend*

{¶ 45} At trial, witnesses for OKL testified that Westfield's refusal to defend the Alcoa lawsuit had placed OKL in an untenable position. OKL did not have the financial resources to litigate the claims, despite its valid defenses. OKL was forced into an unfavorable and costly settlement agreement. This agreement required OKL to stop selling its FBR product. OKL incurred over $100,000 in developing a replacement product. Additionally, OKL gave Alcoa an irrevocable license to sell products covered by an OKL patent, allegedly worth over $1 million. Westfield argued that such damages were too speculative. The jury awarded no damages in these respects.

## *XIV. Bad–Faith Claim*

{¶ 46} In support of its bad-faith claim, OKL presented evidence that Steve Mosure, a Westfield claims representative, had rejected OKL's request for a defense without reviewing the applicable 1999–2000 policy. Instead, Mosure had sought and received a legal opinion from outside counsel as to the applicability of the 1994–1995 policy. Unlike the 1999–2000 policy, the 1994–1995 policy did not contain specific coverage for trade-dress infringement under the "advertising injury" portion of the policy. Outside counsel concluded that there was no coverage under the 1994–1995 policy, but requested to see policies from later years because the Alcoa complaint, filed in January 2000, contained no averments of when OKL's alleged misconduct had occurred. Instead, the complaint referred simply to ongoing, present misconduct. Without further inquiry or followup in response to outside counsel's request, Mosure informed OKL of the rejection. OKL's counsel responded to the denial by faxing to Mosure pertinent pages from the 1999–2000 policy and asking for a discussion of the case. Despite this request, Westfield decided to file a declaratory action under the 1994–1995 policy. It later voluntarily dismissed that action.

---

49. See *Roberts v. United States Fid. & Guar. Co.* (1996), 75 Ohio St.3d 630, 633–634, 665 N.E.2d 664.

{¶ 47} To show that its failure to defend was reasonably justified, Westfield argued that Alcoa did not seek redress from OKL for any advertising injury. Westfield alleged that correspondence between OKL and Alcoa demonstrated this. Further, Westfield alleged that OKL knew that the "true facts" of the Alcoa allegations did not concern an "advertising injury," and that, despite initially offering to provide Westfield's claims adjuster with documents revealing this information, it intentionally failed to do so. Ultimately, Westfield claimed, the decision not to defend was reasonably justified because there was no coverage under the policy. Ultimately, the jury found that Westfield's failure to defend was reasonably justified.

### XV. Striking the Testimony of OKL's Expert Witness

{¶ 48} In its second assignment of error, OKL alleges that the trial court erred in striking the testimony of Robert E. Clines, an insurance claims handler for 37 years. Clines underwent a significant voir dire examination prior to testifying. The court accepted his qualifications as an expert in standard procedures that were used in the industry for investigation, review, and analysis in evaluating coverage when an insured had tendered a defense to its insured. After direct examination, cross-examination, and redirect examination of this witness, Westfield moved to strike the entirety of Clines's testimony. Westfield claimed that Clines, as an expert, was required to couch his entire testimony in terms of a "reasonable degree of professional insurance probability." The trial court agreed, stating that Clines had not used the "magic words," and struck all of Clines's testimony. This was obvious error.

{¶ 49} When Clines testified before the jury, he reviewed his qualifications and his experience, and properly identified materials in the record that he had reviewed to formulate his opinions regarding the proper investigation of OKL's claim under the insurance policy. Clines did not need to couch this testimony in terms of a "reasonable degree of professional insurance probability." His testimony did not contain predictions of future events, nor did it involve his opinion on the causal relationship between certain events.[50] The "probability" standard simply was not applicable to or required for his testimony.[51]

{¶ 50} Westfield argues also that OKL attempted to use Clines's testimony to establish the legal obligations owed by an insurance company to its insured pursuant to the terms and conditions of a policy, and thereby usurped the trial

---

50. See *David v. Schwarzwald, Robiner, Wolf & Rock Co.* (1992), 79 Ohio App.3d 786, 796, 607 N.E.2d 1173.

51. Id.; *Jaric, Inc. v. Chakroff* (1989), 63 Ohio App.3d 506, 519, 579 N.E.2d 493; *Toth v. Oberlin Clinic*, 9th Dist. No. 01CA007891, 2002-Ohio-2211, 2002 WL 987559, ¶ 13.

court's obligation to instruct the jury on the law. We disagree. Clines's expert testimony informed the jury of the proper internal procedures for handling a claim. The jury should have been able to weigh this evidence against testimony from Westfield's witnesses indicating that the claim was properly handled.

{¶ 51} The import of the court's erroneous decision to strike Clines's testimony is clear—OKL was not able to effectively present its counterclaims. The jury may have rendered different verdicts if it had been able to consider Clines's testimony. Accordingly, OKL's second assignment of error is sustained.

## XVI. The Court's Ex Parte Comments to the Jury

{¶ 52} The trial transcript reflects that, after the presentation of the evidence to the jury, but before closing argument, the trial court spoke to the jury in the jury room. Neither party was present, but the court reporter recorded the court's communications with the jurors. OKL did not learn of the comments until the transcript was prepared for this appeal.

{¶ 53} The court's entire communication consisted of the following: *"What we are proposing to do, and if it's all right with all of you, we've still got a lot of instructions to go through with these people, and the attorneys have caused me a lot of heartburn in my old age.* And what I was going to suggest is maybe if you all go out and take a break, if you want something to eat, take a break, you have it, or get a sandwich. Because when you come back, if you come back at eleven, we'll be ready, and then we'll start, because we've got two hours. An hour each of closing argument, probably a half hour of instructions, and then the case will go to the jury. Does that sound reasonable to everybody? And she even said, if you want, she will stay and give you a little lesson in court reporting. That's you know, reasonable. Let me know, because no sense in you sitting around and we go forward and you want to break later for lunch. Because once we get started, each side will have an hour for closing and then instructions. So be about two and a half hours. And we are running a little behind, but these things happen. *I think I feel like Henry Kissinger, you know, overseas writing a national contract here, you know, between the Russians and the United States, every word, but that's where we are.* Okay. So let's just keep in mind the previous instructions of the Court, and we'll return at eleven o'clock. We should be ready. Okay. Thanks a lot for your indulgence."* (Emphasis added.)

{¶ 54} OKL assigns this ex parte communication as error under its fourth assignment. We agree that the communication was improper. "As a general rule, any communication between judge and jury that takes place outside the presence of the defendant or parties to a case is error which may warrant the ordering of a new trial."[52] But an error is harmless where the ex parte

---

52. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 149, 524 N.E.2d 881.

communication results in no prejudice.[53] Cases that have found prejudice in an ex parte communication involved the possibility that the jury's verdict might have been influenced by the court's comments.[54]

{¶ 55} Here, the court's ex parte comments were disparaging to counsel. Although both parties could have been prejudiced by these comments, OKL, as the party with the burden of proof, suffered more. The jury may have been influenced by this disparagement in returning its verdicts. Accordingly, the fourth assignment of error is sustained.

{¶ 56} The errors that we have just discussed denied OKL the right to a fair trial by an impartial jury. Based upon these prejudicial errors, we must reverse the trial court's verdicts and remand the case for a new trial. Although not required to do so, we now discuss issues raised in other assignments of error so that the same error is not made during the retrial of the case.

### XVII. Jury Instructions

{¶ 57} OKL argues that the trial court erroneously instructed the jury that OKL had a duty to cooperate with Westfield. The contested instruction was as follows: "Westfield asserts that OKL and its counsel failed to provide information regarding the nature of the patent and trade dress claim pending against it in the * * * Illinois federal court, even though such information had been requested by Westfield. OKL contends that the duty to defend must be based upon the complaint, and that OKL sent Westfield all appropriate documents for such a determination, with Westfield never mentioning to OKL, despite repeated follow-ups initiated by OKL, that Westfield was still expecting additional information. When a contract includes a cooperation clause, an insured has a duty to cooperate in the investigation and defense of a claim. When an insurance company demands information for purposes of joining with the policyholder in a defense against the party who has sued the policyholder, the policyholder is required to make a fair and frank disclosure of the information requested by the company. *Where the insurer asserts non-cooperation, the insurer has the burden to establish that any alleged failure to cooperate was material and substantial and then must also establish that this alleged failure prejudiced the insurer in its ability to defend in the initial action which was filed against the policy holder.*" (Emphasis added.)

---

53. Id. (holding that the parties were not prejudiced when the trial court merely refused to supply the jury with written instructions).

54. Id.

{¶ 58} This instruction was legally correct, but it was not relevant in this case. The instruction could have been relevant if Westfield had tried to investigate the merits of the Alcoa case in order provide OKL with a defense.[55] But Westfield was not hampered in its defense of Alcoa's claims. It chose not to defend. The trial court found this to be a breach of the insurance contract.

{¶ 59} The duty to defend must be undertaken promptly to be meaningful. This is why the duty attaches when an insured requests its insurer to defend against a complaint containing a claim potentially within a policy's coverage. But if the true facts of the claim indicate that coverage does not apply, the insurer should not have to continue to defend. This is why insurers agree to defend with a reservation of rights.

### XIII. Westfield's Fact Witnesses

{¶ 60} Under Civ.R. 32(A)(3), Westfield notified the court and OKL that it intended to obtain the videotape trial depositions of witnesses residing outside Ohio. OKL moved to preclude these depositions, arguing that the date for discovery had expired. The trial court agreed. Westfield proffered evidence demonstrating that these fact witnesses would have provided relevant evidence to OKL's bad-faith claims.

{¶ 61} We are puzzled about why the trial court precluded these depositions—they were not discovery depositions, they were trial depositions. The notice of these depositions fell within the court's scheduling order for videotaped trial depositions. The trial court's exclusion of these depositions was clearly erroneous. On remand, we hope that this issue will not come up again—there should be enough time so that Westfield should not be prohibited from obtaining and using these depositions.

### XIV. Conclusions and Remand

{¶ 62} We uphold the partial summary judgment entered in OKL's favor on the duty to defend, as well as the award of attorney fees. Having found prejudicial error at trial, we reverse that part of the judgment entered on the jury's verdict and remand this case to the trial court for a new trial. Prior to the new trial, OKL should be allowed to amend and supplement its counterclaims.

Judgment affirmed in part,<br>reversed in part<br>and cause remanded.

HILDEBRANDT, P.J., and WINKLER, J., concur.

---

**55.** See *Weller v. Farris* (1998), 125 Ohio App.3d 270, 276, 708 N.E.2d 271.