OPINION
{¶ 1} National Engineering Contracting Company ("National") and Liberty Mutual Insurance Company ("Liberty") appeal from the judgment of the Franklin County Court of Common Pleas denying its motion for summary judgment and granting summary judgment in favor of defendant United States Fidelity Guaranty Company ("USFG").[1] For the reasons that follow, we affirm in part and reverse in part.
 {¶ 2} On February 21, 1983, National entered into a contract with Lake County, Ohio, as the general contractor on a public project to construct plant improvements at the Greater Mentor Wastewater Treatment Facility. National was required to furnish all the material, supplies, tools, equipment, and labor necessary for the completion of this project. One of the terms of this contract required National to provide certain equipment, including the screw pumps at issue. National subsequently entered into a contract with CPC Engineering Corporation ("CPC," now Wheelabrator). CPC was to design, manufacture, and furnish nine enclosed screw pumps to be used in construction of the plant improvements in accordance with specifications provided by Lake County. The screw pumps were delivered to the facility in October 1983. National stored the pumps on the facility's property. Installation of the pumps was completed in 1985. CPC turned over operation of the pumps to Lake County on May 3, 1985 with a one-year warranty.
 {¶ 3} After installation, Lake County began to experience problems with the pumps. For example, corrosion was apparent on the screw pumps' bearings and ring roller surfaces. Within a few weeks, the pumps began producing excessive noise. Lake County sought correction of these problems from CPC. From approximately 1987 through 1992, CPC attempted to repair the problems. Lake County dealt exclusively with CPC during this time. Eventually, CPC ceased its efforts to repair.
 {¶ 4} On March 26, 1996, Lake County sued CPC and National. It alleged that CPC designed, manufactured, and sold defective screw pumps and sought $3.6 million in damages. Lake County alleged that National had improperly stored the pumps sold by CPC and improperly installed the equipment. National was insured under a commercial general liability policy issued by USFG for the period of January 1, 1983 through January 1, 1986. A subsequent policy was issued to cover January 1, 1986 through January 1, 1987. National was served with the summons and complaint and forwarded copies of each to USFG on April 3, 1996. National requested that USFG provide a defense and indemnity as some of the claims were potentially covered during the time USFG's policies were in effect. USFG denied coverage and denied its duty to defend. From January 1, 1987 forward, National was insured under a commercial general liability policy issued by Liberty. National also forwarded copies of the lawsuit to Liberty and Liberty agreed to provide a defense under a reservation of rights. During the course of the lawsuit, Liberty kept USFG informed as to the proceedings and developments. On November 12, 1996, National provided USFG with discovery responses that documented damage to Lake County as early as 1985 in relation to the screw pumps. National reiterated its request that USFG provide a defense. USFG refused.
 {¶ 5} In January 1997, Lake County filed an amended complaint asserting additional causes of action against National. The amended complaint alleged that CPC failed to provide National with lower bearings in any of the screw pumps that met contractual specifications, thereby breaching its contract with Lake County and National. Lake County alleged that National breached the contract by purchasing the defective screw pumps from CPC, resulting in premature wear of the ring and roller surfaces of the pumps, excessive noise, and excessive vibrations. Lake County further claimed that National improperly stored and installed the pumps resulting in a breach of contract, engaged in misrepresentation, and breached implied warranties of merchantability and fitness for a particular purpose.
 {¶ 6} On May 29, 1997, the parties in the Lake County lawsuit attended a court-mandated settlement conference where a settlement was reached. CPC agreed to pay $540,000 and National agreed to pay $240,000. National also reimbursed Liberty in the amount of $76,482.92 in defense costs. National and Liberty agreed that National would pay $100,000 of the settlement, Liberty would pay $140,000, and then they would both seek recovery of their respective contributions from USFG. National and Liberty filed the instant lawsuit against USFG alleging breach of the insurance contract (duty to defend), breach of contract (duty to indemnify), subrogation, contribution/indemnification, and declaratory judgment. National demanded judgment in the amount of $176,482.92 ($100,000 plus defense costs of $76,482.92), plus costs, expenses, and interest. Liberty demanded judgment in the amount of $140,000 plus prejudgment interest, costs, expenses, attorney fees, and any applicable interest.
 {¶ 7} The parties filed cross-motions for summary judgment. USFG claimed that as a matter of law, it had no duty to defend or indemnify National. National claimed the USFG policies provided coverage for the claims, thus USFG owed National a duty to defend. Liberty claimed it was entitled to subrogation to recover from USFG the settlement sums it paid in settlement of the claims asserted against National. The trial court granted USFG's motion for summary judgment. The trial court found that based on the business risk exclusions, USFG had no duty to defend. National and Liberty filed a motion for reconsideration, which the court denied. However, the parties had questions about whether the decision was a final appealable order. The court issued a judgment entry stating that its decision was based on exclusion (m) instead of (o), and that summary judgment was granted as to all claims. The court stated pursuant to Civ.R. 54(B) there was no just reason for delay. The instant appeal followed.
 {¶ 8} National and Liberty ("appellants") assert the following assignments of error:
1. The trial court erred to the prejudice of the Plaintiffs/Appellants in denying their Motion for Summary Judgment and finding that Defendant/Appellee United States Fidelity Guaranty Company ("USFG") did not breach its applicable insurance policies with Plaintiff/Appellant National Engineering Contracting Company ("National") because two "business risk" exclusions therein — Exclusion (m) and Exclusion (A)(2)(d)(iii) — applied and barred National from defense and indemnity coverage for the underlying lawsuit.
2. The trial court erred to the prejudice of Plaintiffs/Appellants in denying their Motion for Summary Judgment and finding that, because USFG did not owe a duty to defend and indemnity to National, Liberty Mutual Insurance Company ("Liberty Mutual") was not entitled to subrogation from USFG of the amount of its payment of the settlement in the underlying action.
3. The trial court erred to the prejudice of Plaintiffs/Appellants in denying their Motion for Summary Judgment and denying their recovery of prejudgment interest under O.R.C. 1343.03(A) on defense costs and indemnity payments due from Defendant/Appellee USFG.
4. The trial court erred to the prejudice of Plaintiffs/Appellants in denying their Motion for Summary Judgment and denying recovery of attorney fees and expenses as compensatory damages resulting from Defendant/Appellee USFG's breach of its applicable insurance policies and its duty to defend and indemnify.
5. The trial court erred to the prejudice of the Plaintiffs/Appellants in granting Defendants/Appellees' Motion for Summary Judgment and finding that USFG did not breach its insurance policies with National and did not owe National a duty to defend or indemnify it with respect to the underlying lawsuit.
6. The trial court erred to the prejudice of the Plaintiffs/Appellants in denying their Motion to Reconsider.
 {¶ 9} Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd. Of Commrs. (1997),123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court."Mergenthal v. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates the following: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State exrel. Grady v. State Emp. Relations Bd. (1997),78 Ohio St.3d 181, 183. In the summary judgment context, a "material" fact is one that might affect the outcome of the suit under the applicable substantive law. Turner v. Turner (1993),67 Ohio St.3d 337, 340. When determining what is a "genuine issue," the court decides if the evidence presents a sufficient disagreement between the parties' positions. Id.
 {¶ 10} In Dresher, the Ohio Supreme Court held that a party seeking summary judgment on the ground that the nonmoving party cannot prove its case bears the initial burden to inform the trial court of the basis for the motion and identifying the portions of the record demonstrating an absence of a genuine issue of material fact. Dresher v. Burt (1996),75 Ohio St.3d 280. The moving party does not discharge its burden simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Id. Rather, the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates the nonmoving party has no evidence to support its claims. Id. Further, when a motion for summary judgment has been supported by proper evidence, the nonmoving party may not rest on the mere allegations of the pleading, but must set forth specific facts, by affidavit or otherwise, demonstrating that there is a genuine triable issue.Jackson v. Alert Fire Safety Equip., Inc. (1991),58 Ohio St.3d 48, 52. If the nonmoving party does not demonstrate a genuine triable issue, summary judgment shall be entered against that party. Civ.R. 56(E).
 {¶ 11} In the first, fifth, and sixth assignments of error, appellants argue the trial court erred in denying their motion for summary judgment and granting USFG's motion for summary judgment, finding that USFG had no duty to defend and therefore no duty to indemnify appellants.
 {¶ 12} The first issue to resolve is whether the claims asserted by Lake County against National constitute claims for "property damage" resulting from a potential "occurrence," as to trigger a duty to defend. The two USFG policies contain the following language:
The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
A. bodily injury; or
B. property damage, to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent. * * *
 {¶ 13} The policies also contain definitions of "occurrence" and "property damage" as follows:
"[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured;
* * *
"[P]roperty damage" means:
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or
(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
 {¶ 14} An insurer's duty to defend is separate and distinct from its duty to indemnify. Erie Ins. Exchange v. Colony Dev.Corp. (1999), 136 Ohio App.3d 406, 412. The policy at issue contains a provision whereby USFG agrees to defend against suits filed against the insured even if the allegations are false or groundless. When a policy contains such a provision, an insurer is obligated to defend a claim covered by the policy even if the allegations are false, groundless, or fraudulent. Id. The test of the duty to defend an action against an insured is the scope of the allegations in the complaint. Id., quoting Motorists Mut.Ins. Co. v. Trainor (1973), 33 Ohio St.2d 41. In WilloughbyHills v. Cincinnati Ins. Co. (1984), 9 Ohio St.3d 177, the Ohio Supreme Court stated:
 Where insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within policy coverage, or there is some doubt as to whether a theory of recovery within policy coverage has been pleaded, the insurer must accept the defense of the claim.
Id. at syllabus.
 {¶ 15} Therefore, where a complaint states a claim potentially or arguably within policy coverage, the insurer has an absolute duty to assume the defense. Erie, supra. Only if there is no possibility of coverage based on the allegations in the complaint will the insurer escape this duty. Id. Once a duty to defend is recognized, "speculation about the insurer's ultimate obligation to indemnify is premature until facts excluding coverage are revealed during the defense of the litigation and the insurer timely reserves its rights to deny coverage." Id. at 413. The obligation exists even if the complaint alleges both covered and non-covered claims. Id.
 {¶ 16} Here, the claims asserted against National in the underlying Lake County lawsuit include breach of contract, breach of warranty, negligent storage, negligent installation, and intentional/negligent representation. The issue is whether the "negligent" or defective performance claims constitute a potential occurrence under the policy.
 {¶ 17} Several courts in Ohio have held that a commercial general liability ("CGL") policy such as the one at issue does not insure against claims for defective or negligent workmanship or construction because those claims do not constitute an occurrence under the policy. These courts hold that CGL policies are intended to insure the risks of an insured causing damage toother persons and their property, not to insure the risks of an insured causing damage to the insured's own work.Environmental Exploration Co. v. Bituminous Fire Marine Ins.Co. (Oct. 16, 2000), Stark App. No. 1999CA00315 (defective workmanship does not constitute an accident and since, without an accident, there can be no occurrence as such term is defined in the insurance policy, coverage is restricted to claims of negligent manufacture resulting in an occurrence); Heile v.Herrmann (1999), 136 Ohio App.3d 351 ("defective workmanship does not constitute an `occurrence' in policies such as the one here"); Royal Plastics, Inc. v. State Auto. Mutual Ins. Co.
(1994), 99 Ohio App.3d 221, 225 ("the insurance policy defines `occurrence' to mean `an accident.' This language is `clear and plain, something only a lawyer's ingenuity could make ambiguous'"). Therefore, coverage is limited to claims of negligent manufacture that result in an occurrence.
 {¶ 18} However, this court and others have interpreted "occurrence" differently. In Erie, supra, this court concluded that allegations of negligent construction and design were sufficient to demonstrate an "accident," hence a potential "occurrence" under the policy, because the acts were not done with the intent or expectation of causing damage or injury. Id. at 414.[2] While a commercial general liability policy is not a performance bond, the "rationale for the proposition is not that the allegations of negligent construction or design practices do not fall within the broad coverage for property damage caused by an occurrence, but that, the damages resulting from such practices are usually excluded from coverage by the standard exclusions found in such policies." Id; Hahn's Elec.Co. v. Hartford Cas. Co., Franklin App. No. 01AP-1391, 2002-Ohio-5009, at ¶ 37 (arguably the allegations fall within policy's coverage for property damage caused by an occurrence "because the allegations concern a contractor's negligent performance of its work and a breach of its duty to perform in a workmanlike manner"); Zanco, Inc. v. Michigan Mut. Ins. Co.
(1984), 11 Ohio St.3d 114, 115-116 (stating in dicta that a "perfectly credible argument can be made that the allegations in the Pinecrest counterclaim [for breach of its duty to perform in a workmanlike manner] were within these initial provisions for coverage"); Acme Constr. Co., Inc. v. Continental Nat. Indemn.Co., Cuyahoga App. No. 81402, 2003-Ohio-434 (alleged negligence or defective workmanship of sewer system constituted an occurrence).
 {¶ 19} After examining both the original complaint in 1996 and the amended complaint in 1997, we find sufficient allegations of a potential occurrence within USFG's coverage period. Erie,
supra. With respect to the original complaint, National was named as a defendant. USFG insured National for the time period up to January 1, 1987. USFG was served with a copy of the complaint and knew, or with the exercise of reasonable diligence should have known, of the existence of the contract between National and Lake County. Therefore, we find there was a "possibility" that some of the claims occurred during USFG's coverage period. SeePanzica Constr. Co. v. Ohio Cas. Ins. Co. (May 16, 1996), Cuyahoga App. No. 69444 (insurance company had a duty to defend even though complaint alleged no dates of occurrences).
 {¶ 20} As to the amended complaint, we find the allegations are likewise sufficient to demonstrate a potential occurrence under USFG's policy. The allegations are more detailed alleging a contract between National and Lake County in the mid-1980's, and CPC coming to the Lake County facility to repair problems as early as 1987. Based on the scope of the allegations, we find the amended complaint sufficiently demonstrates a potential or partial "occurrence" under USFG's policy. Erie, supra.
 {¶ 21} The next issue is whether the allegations of the complaint are sufficient to defeat any "business risk" exclusions for purposes of the duty to defend. Zanco, supra (no duty to defend where allegations did not fall within the "coverage" provided). Such exclusions ensure that damage resulting from a contractor's own work is excluded as liability insurance should not be a warranty or performance bond for general contractors.Erie, supra; Hahn's, supra. Importantly, business risk exclusions do not defeat an insurer's duty to defend if there are allegations of "collateral" damage, e.g., damage to property other than the insured's property. Id.
 {¶ 22} Arguably or potentially, the original complaint contained an allegation of collateral damage in ¶ 13. That paragraph stated "[d]efendants breached their contract with plaintiff by selling plaintiff equipment with defects, including, but not limited to, parts that were incorrectly machined, thereby causing premature wear and damage to other equipment at theGreater Mentor Wastewater Treatment Plant." (Emphasis added.) We find this allegation sufficient for purposes of triggering USFG's duty to defend. Erie, supra (allegations of collateral damage trigger the duty to defend as such damages are not covered by exclusions). As stated previously, it is sufficient that some of the claims arguably or potentially fall within the policy's coverage. Therefore, USFG should have accepted the defense and reserved its rights to assert defenses that later came to light.Westfield Cos. v. O.K.L. Can Line, 155 Ohio App.3d 747,2003-Ohio-7151 (where the insurer's duty is not clear from the complaint, but the allegations state a claim arguably or potentially within coverage, the insurer must accept the defense but is free to reserve its rights to assert defenses that later come to light.) Accordingly, appellants' first, fifth, and sixth assignments of error are sustained with respect to USFG's duty to defend.
 {¶ 23} In the fourth assignment of error, appellants assert the trial court erred in not awarding attorney's fees and expenses as compensatory damages. Since we find USFG breached its duty to defend, the case must be remanded to the trial court to determine the amount of attorney's fees owed as a result of USFG's breach of contract. Generally, attorney's fees are allowable as damages in breach of contract cases where the parties have bargained for a particular result and the breaching party's wrongful conduct led to the legal fees being incurred.Westfield, supra. Here, the insurance policy supports an award of attorney's fees because USFG contractually accepted the duty to defend against lawsuits to which the policy "potentially" applied, even if the lawsuit was false or groundless. Id. USFG breached that duty. National reimbursed Liberty for the amount of attorney's fees Liberty spent for National's defense in the Lake County lawsuit. Accordingly, the trial court must determine the amount USFG owes to National for breach of its contractual duty to defend the underlying Lake County lawsuit. The trial court should also determine whether attorney's fees are appropriate for the amount incurred in the instant action. Id., citing Trainor.
Accordingly, appellants' fourth assignment of error is sustained and the matter is remanded to the trial court for a determination of attorney's fees.
 {¶ 24} With respect to actual coverage under USFG's policy, the parties litigated the issue below in the context of summary judgment. The trial court found USFG did not breach its duty to defend or indemnify for the underlying Lake County lawsuit because the damages complained of were excluded from coverage. Therefore, we will address the issue of coverage. See Erie Ins.Exchange v. Colony Dev. Corp. (June 12, 2001), Franklin App. No. 00AP-1334 ("Erie II") (remanding to trial court for determination of indemnification because parties did not
litigate the issue of coverage).
 {¶ 25} USFG argues that several exclusions apply to preclude coverage. For the following reasons, we find exclusions (m) and (A)(2)(d)(iii) apply to exclude coverage.
 {¶ 26} Exclusion (m) provides that the insurance does not apply to:
* * * [L]oss of use of tangible property which has not been physically injured or destroyed resulting from
(1) a delay in or lack of performance by or on behalf of the Named Insured of any contract or agreement, or
(2) the failure of the Named Insured's products or work performed by or on behalf of the Named Insured to meet the level of performance, quality, fitness or durability warranted or represented by the Named Insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's products or work performed by or on behalf of the Named Insured after such products or work have been put to use by any person or organization other than an Insured.
 {¶ 27} This exclusion generally operates to exclude coverage for damage to the work of the insured as a result of poor or defective work performance. Hahn's, supra; Erie, supra. This is to discourage careless work by the contractor. The exception to the exclusion provides coverage for the consequential damage to property other than the insured's, arising out of sudden and accidental physical injury to the insured's product after it has been put to its intended use. United Steel Fabricators, Inc. v.Fidelity Guar. Ins. Underwriters, Inc. (Mar. 11, 1993), Franklin App. No. 92AP-1171. Exclusion (n) excludes "property damage to the Named Insured's products arising out of such products or any part of such products." Named insured's products are defined as "goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, including any container thereof." Further, in the Broad Form Comprehensive General Liability Endorsement, exclusion (A)(2)(d)(iii) provides that coverage will not apply to "that particular part of any property, not on premises owned by or rented to the insured; * * * (iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured." This excludes claims for the repair and replacement of defective work not on the insured's property. Hahn's, supra.
 {¶ 28} Appellants argue that CPC did not do work "on behalf of" National. We disagree. National was the general contractor for the contract with Lake County that included the screw pumps at issue. National then entered into a contract with CPC for the manufacture of the screw pumps to comply with the specifications set forth in the Lake County contract. As general contractor, National is responsible for completion of the entire contract. CPC performed part of that contract as a subcontractor. Therefore, we find the actions with respect to the screw pumps were committed by National, or by CPC on National's behalf.
 {¶ 29} Appellants further argue there is evidence of collateral or consequential damage thereby precluding operation of the exclusions. USFG maintains appellants have not put forth a single piece of evidence demonstrating such damages. Rather, the damage complained of was to the screw pumps and related equipment, all provided by National or on its behalf. We agree with USFG. In USFG's discovery propounded to appellants, USFG requested documents demonstrating any so-called collateral damage. Appellants responded by referring to documents produced in the underlying lawsuit between Lake County and National filed in Lake County. Those documents are not in the record before this court. Instead of producing specific documents in response, appellants assert that Mr. Bunner's affidavit and certain attorney notes attached to their motion for summary judgment and appellate brief, are sufficient to establish collateral damages. Mr. Bunner's affidavit at ¶ 31 states the following:
* * * Specifically, as a result of National Engineering's alleged conduct, the County claimed damages:
To the nine screw pumps, including removal, repair and/or replacement;
For gouges, cracks, and frosting to the ring rollers and bearings;
For corrosion to the screw pumps;
For excessive noise, including construction of a sound proof barrier;
For excessive vibrations and effects on related equipment, including premature wear and tear on gear boxes, ring rollers, and bearings;
For plant downtime during repairs of the nine screw pumps;
For County personnel overtime and labor costs associated with efforts to correct the problems arising out of the operation of the screw pumps;
For engineering, testing and consulting services relating to efforts to correct problems arising out of the operation of the screw pumps; and,
For contract administration and construction supervision and administration costs.
 {¶ 30} We find this "evidence" fails to demonstrate the existence of collateral damage sufficient to defeat USFG's motion for summary judgment. Simply put, there is no actual evidence demonstrating damage to property other than the property provided by CPC on National's behalf. As stated in oral argument, all of the damage was to the screw pumps and related equipment provided by National. Further, excessive noise and vibrations caused by the defective pumps and related equipment is not
collateral damage. It is simply the result of the defective pumps. The excessive noise and vibrations did not cause damage to other property at the facility.
 {¶ 31} The cases cited by appellants regarding collateral damages are distinguishable from the present case. Those cases deal with damage to property other than the insured's property. In Alloyd, there was damage to the Library Board's property caused by the faulty work that Alloyd performed in repairing the roof and installing skylights. Indiana Ins. Co. v. AlloydInsulation Co., Montgomery App. No. 18979, 2002-Ohio-3916. InAkers, water entered the building of a third party and caused property damage due to the contractor's faulty roof work. Akersv. Beacon Ins. Co. of Am. (Aug. 31, 1987), Marion App. No. 9-86-16. Similarly, in Acme, the contractor's defective freezer compressor caused the meat stored in the freezer to spoil. AcmeSteak Co., Inc. v. Great Lakes Mechanical Co. (Sept. 29, 2000), Mahoning App. No. 98-C.A.-146. Further, Erie, supra, dealt only with the duty to defend and did not discuss indemnification, e.g., actual coverage.
 {¶ 32} Lake County's allegations of plant downtime and use of their own employees to help repair the pumps are likewise insufficient evidence of collateral damage in that they are excluded from coverage. Therefore, the exclusions apply to preclude coverage in this case as there is no evidence of damage to property other than what was provided by National or CPC on National's behalf. Appellants' arguments to the contrary are without merit. As many cases have stated previously, a commercial liability policy is simply not a performance bond and is not intended to insure the contractor's work performed or work product. Accordingly, USFG has no duty to indemnify as they were under no obligation to pay damages under the policy.
 {¶ 33} Based on the foregoing, the scope of the allegations in the complaints demonstrate a potential occurrence under USFG's policy that is not otherwise excluded for purposes of the duty to defend. USFG should have undertaken National's defense in the Lake County lawsuit and reserved its rights to assert defenses that later came to light. Therefore, National is entitled to recover attorney's fees for USFG's breach of its contractual duty. However, based on the exclusions contained in the policy, there is no actual coverage under the policy. Commercial general liability policies are not intended to insure the work product of general contractors. Although exclusions do not apply if there is evidence of collateral damage, there is no such evidence here. All the evidence points to the fact that the damages in this case relate to the screw pumps and related equipment, e.g., gauges and ring and roller bearings, provided by National or by CPC on behalf of National. Exclusions (m) and (A)(2)(d)(iii) operate to preclude actual coverage under the policy. Therefore, USFG is not obligated to pay damages under the policy.
 {¶ 34} Accordingly, appellants' first, fifth, and sixth assignments of error are sustained with respect to USFG's duty to defend. Appellants' fourth assignment of error is sustained and the case is remanded to the trial court for a determination of the amount of attorney's fees and expenses associated with USFG's breach of its duty to defend. Appellants' first, fifth, and sixth assignments of error are overruled with respect to the issue of indemnification. Appellants' second assignment of error is overruled. Appellants' third assignment of error is sustained for the sole purpose of allowing the trial court to rule on the issue.
Judgment affirmed in part; reversed in part and causeremanded.
Bowman and Petree, JJ., concur.
[1] St. Paul Fire Marine Insurance Company was named as the corporate parent of USFG.
[2] The definition of "occurrence" in Erie provided: "an accident, including continuous or repeated exposure to the same general, harmful conditions." Id. The court went on to define the term accidental and concluded it meant unexpected as well as unintended. In the case at bar, "occurrence" is defined as an accident, "including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured."