**[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 1.]**

MANTUA MANUFACTURING COMPANY, APPELLEE, *v.* COMMERCE EXCHANGE BANK, APPELLANT.

[Cite as *Mantua Mfg. Co. v. Commerce Exchange Bank*, 1996-Ohio-187.]

*Uniform Commercial Code—Letters of credit—Direct conflict between provision of Uniform Customs and Practice for Documentary Credits (Rev. 1983) and an analogous provision of R.C. Chapter 1305—Uniform Customs and practice's terms replace those of R.C. Chapter 1305, when—Phrase "other person who causes an issuer to issue a credit" in R.C. 1305.01(A)(7), construed.*

1. When a letter of credit states that it is subject to the Uniform Customs and Practice for Documentary Credits (Rev. 1983), International Chamber of Commerce Publication No. 400 ("UCP") and there is a direct conflict between a provision of the UCP and an analogous provision of R.C. Chapter 1305, the UCP's terms replace those of R.C. Chapter 1305, unless that replacement violates the conditions of R.C. 1301.02(C).

2. The phrase "other person who causes an issuer to issue a credit" in R.C. 1305.01(A)(7) refers to a party in a transaction not involving a sale of goods who stands in a position analogous to that of a buyer in a sale of goods.

(No. 94-2139—Submitted December 13, 1995—Decided March 1, 1996.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 65861.

————————————

{¶ 1} This matter arises from a transaction involving appellant Commerce Exchange Bank ("Commerce"); appellee Mantua Manufacturing Company ("Mantua"), a company which manufactures steel bed frames; Dart Steel, Inc. ("Dart"), a steel brokerage firm; and LTV Steel Company ("LTV"), a steel mill. In late 1987 Mantua was acquiring the steel it used in its production of bed frames

through Dart. At the same time, Edward Weintraub, the president of Mantua, had become interested in expanding his company's steady access to steel.

{¶ 2} To accommodate Weintraub, Jerry Eisner, the president of Dart, attempted to secure a more constant flow of steel to Mantua from LTV. However, LTV was only willing to supply Dart with larger quantities of steel on the condition that Dart provide LTV with a letter of credit ("LC"). Eisner asked Commerce to issue an LC on Dart's behalf in favor of LTV. After reviewing Dart's financial statements, Commerce determined that Dart would need to provide some form of security before Commerce would issue the LC. Weintraub agreed to provide Dart with the necessary security.

{¶ 3} In January 1988, Weintraub and Eisner met with Richard C. Grob, a vice-president of loan administration for Commerce. At that meeting, Weintraub agreed to purchase a certificate of deposit ("CD") from Commerce in the amount of $100,000. At the same meeting Weintraub, on behalf of Mantua, executed and delivered to Commerce an "Authority to Hypothecate." This document gave Dart the authority to grant a security interest in the CD to Commerce as collateral for any "debt" owed by Dart to Commerce, including any debt arising from a draw on the proposed letter of credit.[1]

{¶ 4} At the same meeting, Eisner assigned the CD to Commerce as security for any debt owed by Dart to Commerce. On January 21, Dart also executed a promissory grid note to Commerce in the amount of $50,000. This note obligated Dart to reimburse Commerce for any draw on the LC by LTV. The note listed Mantua's CD as collateral.

---

1. The Authority to Hypothecate defined "debt" as "all or any part of liabilities (including principal and interest thereon) now owing or hereafter incurred by [Dart] to [Commerce] and includes (without limitation) every such liability *** whether created by loan, overdraft, guaranty of payment or other contract or by quasi-contract, tort, statute or other operation of law ***."

**{¶ 5}** On January 25, Commerce issued an irrevocable letter of credit for $50,000 to LTV. The letter of credit permitted LTV to make a draw against the LC upon LTV's presentment of an unpaid invoice. The LC also stated that it was "subject to the Uniform Customs and Practice for Documentary Credits (Rev. 1983), International Chamber of Commerce—Publication 400."

**{¶ 6}** The LC had an expiration date of July 11, 1988; however, upon Dart's request, Commerce extended the term of the LC to January 10, 1989. Over the next two years, Dart requested an extension of the LC's expiration date five more times. The expiration date of the sixth and final extension was April 10, 1991.[2]

**{¶ 7}** On February 28, 1991, LTV presented the documentation necessary to effect a draw on the LC. Commerce honored the presentment and formally demanded repayment from Dart. Approximately five days later, Commerce informed Mantua that if Dart did not reimburse Commerce for the draw on the LC, Commerce would redeem the CD and apply the proceeds to Dart's debt. Dart did not reimburse Commerce for the draw on the LC, and on April 11, 1991, Commerce redeemed the CD.

**{¶ 8}** Mantua filed a complaint in the Court of Common Pleas of Cuyahoga County on April 18, 1991. In its complaint, Mantua alleged that Commerce was not authorized to use the CD as security because Mantua had not consented to the final extension of the letter of credit. Mantua asserted that it was a "customer" of Commerce, as that term is defined by R.C. 1305.01(A)(7). Therefore, Commerce was obligated under R.C. 1305.05(B) to obtain Mantua's consent before Commerce renewed the LC. Mantua argued that Commerce's failure to obtain this consent

---

2. Prior to the original CD's maturity on July 11, 1988, Grob contacted Weintraub to discuss the terms under which Weintraub wished to purchase a new CD to serve as collateral. Weintraub settled on another six-month CD, with a maturity date of January 9, 1989, but asked Grob to reduce the amount in the new CD to $50,000. Grob complied, and Mantua executed a new Authority to Hypothecate in favor of Dart to reflect the new value of the CD. From that time forward the LC was secured by successive CDs in the amount of $50,000.

invalidated the final extension of the LC and ended Commerce's authority to redeem the CD.

**{¶ 9}** At the close of Mantua's case, Commerce unsuccessfully moved for a directed verdict on the grounds that Mantua was not a "customer" as that term is defined under R.C. 1305.01(A)(7). Commerce repeated this motion at the close of its case, but was again denied. The jury returned a verdict in favor of Mantua for $50,000 and the trial court entered judgment on May 13, 1993. Commerce subsequently moved for judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied both of these motions.

**{¶ 10}** On appeal, Commerce argued that the trial court erred by denying Commerce's motion for directed verdict and its motion for judgment notwithstanding the verdict.[3] The court of appeals affirmed the trial judge's disposition of both motions.

**{¶ 11}** The cause is now before this court pursuant to the allowance of a discretionary appeal.

───────────────

*Strachan, Green, Miller, Olender & Hobt, William R. Strachan* and *Kirk W. Roessler*, for appellant.

*Kelley, McCann & Livingstone, Thomas J. Lee* and *Peter M. Poulos*, for appellee.

*Harris, McClellan, Binau & Cox* and *John F. Casey;* and *Jeffrey D. Quayle*, urging reversal for *amicus curiae*, Ohio Bankers' Association.

───────────────

**WRIGHT, J.**

───────────────

3. Commerce also claimed that the jury's verdict was against the manifest weight of the evidence. However, the court of appeals ruled that the jury's verdict was supported by competent and credible evidence and so was not against the manifest weight of the evidence. Commerce did not raise this issue in its appeal before this court.

**{¶ 12}** This appeal invites us to determine whether the trial court correctly refused to grant appellant Commerce's motion for a directed verdict and motion for judgment notwithstanding the verdict. The standards applied to motions for directed verdict and motions for judgment notwithstanding the verdict are identical. *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 137, 17 OBR 281, 282, 477 N.E.2d 1145, 1147, citing *Ayers v. Woodard* (1957), 166 Ohio St. 138, 1 O.O.2d 377, 140 N.E.2d 401, paragraph one of the syllabus. Specifically, either motion should be granted when "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4). We find, as a matter of law, that Commerce did not need Mantua's consent prior to the extension of the letter of credit. Accordingly, we reverse the judgment of the court of appeals.

**{¶ 13}** In the courts below, Mantua argued that it was a "customer" of Commerce, as that term is defined under R.C. 1305.01(A)(7). Consequently, Mantua asserted, Commerce could extend the letter of credit ("LC") only after it received the consent of both LTV and Mantua. This conclusion was based on R.C. 1305.05(B), which states that:

"Unless otherwise agreed once an irrevocable credit is established as regards the customer it can be modified or revoked only with the consent of the customer and once it is established as regards the beneficiary it can be modified or revoked only with his consent."[4]

---

4. A "beneficiary" is defined under R.C. Chapter 1305 as "a person who is entitled under [a letter of credit's] terms to draw or demand payment." R.C. 1305.01(A)(4). In this transaction, the beneficiary was LTV.

**{¶ 14}** Commerce contends that the rights of the parties in this transaction were governed by the Uniform Customs and Practice for Documentary Credits (Rev. 1983), International Chamber of Commerce Publication No. 400 ("UCP"), which does not require an issuing bank to obtain its customer's consent prior to the renewal of a letter of credit. Strictly speaking, the UCP is not law. Dolan, The Law of Letters of Credit (2 Ed. 1991), Section 4.06(1). Rather, it is a "set of rules, generally viewed as customary rules of law, that may be incorporated into the private law of a contract between parties." *Centrifugal Casting Mach. Co., Inc. v. Am. Bank & Trust Co.* (C.A.10, 1992), 966 F.2d 1348, 1351, fn. 3. Although the drafters of the UCP originally intended for it to apply in international letter of credit transactions, banks issuing letters of credit in strictly domestic transactions also incorporate the UCP into the terms of the transaction. Dolan, *supra*, Section 4.06(1)(a); 3 White & Summers, Uniform Commercial Code (4 Ed. 1995) 122, Section 26-3.

**{¶ 15}** The portion of the UCP relied upon by Commerce in this matter states that "[irrevocable letters of credit] can neither be amended nor cancelled without the agreement of the issuing bank, the confirming bank (if any), and the beneficiary."[5] *Id*., Article 10(d). Mantua does not claim to fall within any of the classes listed in Article 10(d). Consequently, if the UCP were the sole source of substantive law governing the LC, Commerce would have been completely within its rights to renew the LC without Mantua's consent. We agree with Commerce that the rights of the parties in the instant dispute are defined by the UCP.

**{¶ 16}** Any analysis of letter of credit law in Ohio must begin with the chapter on letters of credit in Ohio's version of the Uniform Commercial Code

---

5. A "beneficiary" is defined under the UCP as a "third party" to whom a bank issuing a letter of credit is obligated "to make a payment to or to the order of ***, or is to pay or accept bills of exchange (drafts) drawn by ***." UCP Article 2(i). In the instant case, this definition, like that under R.C. 1305.01(A)(4), applies exclusively to LTV.

("UCC"), R.C. 1305.01 <u>et</u> <u>seq</u>. This chapter provides the basis for letter of credit law in this state and generally operates as a set of default rules in those instances when the parties have not agreed to the contrary. 3 White & Summers, *supra*, at 121-122, Section 26-3. Parties to a letter of credit may, however, choose to vary the effects of the provisions of R.C. Chapter 1305 "except as otherwise provided [in that chapter] and except that the obligations of good faith, diligence, reasonableness, and care prescribed by [that chapter] may not be disclaimed by agreement." R.C. 1301.02(C). See, also, R.C. 1305.01(D).

**{¶ 17}** Indeed, R.C. 1305.05(B), the provision relied on by Mantua, explicitly invites such variation by the parties by stating that its terms govern "[u]nless otherwise agreed ***." Commerce contends that the language in the LC referring to the UCP operates as such a variation, to the exclusion of the rights outlined in R.C. 1305.05(B).

**{¶ 18}** We agree with Commerce and find that UCP Article 10(d) supplanted R.C. 1305.05(B) in this case. Indeed, we hold that when a letter of credit is subject to the UCP and there is a direct conflict between a provision of the UCP and an analogous provision of R.C. Chapter 1305, the UCP terms replace those of R.C. Chapter 1305, unless that replacement violates the conditions of R.C. 1301.02(C). Accordingly, Commerce had no duty to seek Mantua's consent prior to the renewal of the LC.

**{¶ 19}** Mantua attempts to circumvent the conclusion we reach by arguing that its rights could not be limited by the terms of the LC because it was not a party to the LC. This argument is unavailing. Multiple documents should be construed together if they are part of the same transaction. *Center Ridge Ganley, Inc. v. Stinn* (1987), 31 Ohio St.3d 310, 314, 31 OBR 587, 590, 511 N.E.2d 106, 109, citing *White v. Brocaw* (1863), 14 Ohio St. 339; *Thayer v. Luce* (1871), 22 Ohio St. 62. Consequently, by signing the Authority to Hypothecate and making itself a party to

the transaction underlying the LC, Mantua agreed that any of its substantive rights under the law of letters of credit were governed by the UCP .

{¶ 20} Even if the UCP were not the controlling law in this case, Commerce was not obliged to receive Mantua's consent to the renewal of the LC because Mantua was not a "customer" in the letter of credit context.  Under Ohio law, a "customer" in a letter of credit transaction is defined as "a buyer *or other person who causes an issuer to issue a credit* ***."  (Emphasis added.) R.C. 1305.01(A)(7).  Mantua argues that it is "[an]other person who causes an issuer to issue a credit" because its purchase of the CD allowed Dart to secure the LC.  It is apparently Mantua's position that R.C. 1305.01(A)(7) contemplates a "but for" definition of causation for determining whether one is a customer.  We do not find this theory persuasive.

{¶ 21} There is no case law in Ohio interpreting the definition of "customer" found at R.C. 1305.01(A)(7).  However, we receive guidance in our interpretation of R.C. 1305.01(A)(7) from 1301.02(A), which states that R.C. Chapters 1301 through 1310 are to be liberally construed in order to promote their "underlying purposes and policies."  One of the purposes and policies of these chapters is " (2)  *** the continued expansion of commercial practices through custom, usage and agreement of the parties."  R.C. 1301.02(B).  With this consideration in mind, we look to the UCP, which commentators regard as a guide to trade usage in letter of credit transactions.[6]  Dolan, *supra*, Section 4.06(1)(b); 3 White & Summers, *supra*, at 120, Section 26-3.

---

6. Normally, "[t]he existence and scope of such a usage [of trade] are to be proved as facts."  R.C. 1301.11(B).  However, "[i]f it is established that such a usage is embodied in a written trade code or similar writing, the interpretation of the writing is for the court."  *Id*.  It is reasonable to conclude that the UCP falls within the meaning of a "written trade code or similar writing," and so it was properly within the trial judge's discretion to determine whether Mantua fell within R.C. 1305.01(A)(7)'s definition of "customer" by interpreting the UCP definition.

{¶ 22} UCP Article 2 defines "customer" as "the applicant for the credit." In light of this understanding of "customer," the only party which qualifies as a customer in this case is Dart. It was Jerry Eisner, the president of Dart, who approached Commerce about obtaining an LC in favor of LTV. Mantua became involved in the transaction only after Commerce demanded some security for the LC, and Mantua did nothing more than provide collateral to Commerce.

{¶ 23} Indeed, the conclusion above comports with a common-sense reading of R.C. 1305.01(A)(7). The phrase "other person" in R.C. 1305.01(A)(7) cannot, as Mantua suggests, refer to *anyone* who facilitates a letter of credit transaction. Otherwise, under Mantua's proposed definition of "customer," one might argue that Commerce needed to obtain the consent of the company that produced the paper on which the documents were printed, the business which made the ink used on the paper, and the developers who constructed the building in which Grob, Eisner and Weintraub met. Such requirements would be absurd, of course, but that is precisely the point. Mantua's "but for" understanding of "cause" has almost no logical stopping point. Therefore, it cannot supply us with a meaningful interpretation of the expression "other person who causes an issuer to issue a credit."

{¶ 24} Instead, a proper understanding of this phrase comes from the recognition that letters of credit are issued in a variety of commercial contexts. Like the underlying transaction in the current matter, letters of credit are often used in the sale of goods, and so R.C. 1305.01(A)(7) refers expressly to "buyers." However, buyers are but one class of persons who may "cause an issuer to issue a credit." Letters of credit are also used when the underlying transaction involves investment securities, negotiable instruments and documents of title. Uniform Commercial Code Section 5-103, Official Comment 3. Accordingly, "other person who causes an issuer to issue a credit" actually refers to a party in a transaction not involving a sale of goods who stands in a position analogous to that of a buyer in a

sale of goods. This interpretation aligns R.C. Chapter 1305's definition of "customer" with that of the UCP and avoids the overly expansive meaning advanced by Mantua.

{¶ 25} We reverse the decision of the court of appeals and remand to the trial court for disposition of this matter in accordance with our holdings.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, WRIGHT, PFEIFER and COOK, JJ., concur.

F.E. SWEENEY, J., dissents and would affirm the judgment of the court of appeals.

_____