STONEHENGE LAND COMPANY, Appellee,

v.

BEAZER HOMES INVESTMENTS, L.L.C., Appellant.

Stonehenge Land Company, Appellant,

v.

Beazer Homes Investments, L.L.C., Appellee.

[Cite as *Stonehenge Land Co. v. Beazer Homes Invests., L.L.C.*, 177 Ohio App.3d 7, 2008-Ohio-148.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 07AP–449 and 07AP–559.

Decided Jan. 17, 2008.

█

---

Luper, Neidenthal & Logan, L.P.A., and David M. Scott, for Stonehenge Land Company.

Bailey Cavalieri L.L.C., and David A. Dye, for Beazer Homes Investments, L.L.C.

SADLER, Judge.

{¶ 1} This case involves consolidated appeals from the judgment of the Franklin County Court of Common Pleas, entered upon a jury verdict, on the breach-of-contract claims of plaintiff-appellee and cross-appellant, Stonehenge Land Company ("Stonehenge") against defendant-appellant and cross-appellee, Beazer Homes Investments, L.L.C. ("Beazer").

{¶ 2} The relevant factual and procedural history follows. This case concerns the development of a residential subdivision located in the city of Groveport in Franklin County, and known as "Elmont Place." Stonehenge is a land developer, and Beazer is in the business of building and selling single-family homes. On July 27, 2000, Stonehenge entered into a written contract with Beazer's predecessor-in-interest, Crossmann Communities, Inc., d.b.a. Beazer Homes, relating to Beazer's purchase of all of the lots to be developed in Elmont Place (the "2000 contract"). In April 2002, the parties executed an amendment to the 2000

contract, which allowed Stonehenge to sell some lots to another builder, thereby reducing the number of lots that Beazer was required to purchase.

{¶ 3} By letter dated June 9, 2004, Beazer's counsel advised Stonehenge that Beazer did not wish to acquire any additional lots in the Elmont Place development. By letter dated September 9, 2004, however, Beazer's counsel advised Stonehenge that, despite having not received a response to its previous letter, Beazer had reevaluated its position and now wished to move forward with purchasing additional lots. Later, following additional negotiations, the parties entered into another contract dated November 23, 2004 (the "2004 contract"). This contract concerned only the lots located in Sections 1 and 2 of Phase III of the Elmont Place development.

{¶ 4} The 2004 contract provided for separate purchase prices for lots in Sections 1 and 2, and contained the following provision with respect to earnest money, including a liquidated-damages clause:

2. Earnest Money Deposit. Upon execution of this Agreement, Builder shall deposit Seventeen Thousand Dollars ($17,000) (the Earnest Money) with Developer, to be held by Developer in trust upon and subject to the terms and conditions set forth herein.

Builder shall forfeit the earnest money to Developer if Builder fails or refuses to perform its obligations herein specified. In such event, damages will be impossible to ascertain; therefore, such forfeiture of the Earnest Money shall constitute liquidated damages and not a penalty, and shall be Developer's sole remedy at law or in equity for a breach of any covenants or agreements of this Agreement to be performed or observed by Builder.

Notwithstanding the foregoing, and any other provision of this Agreement to the contrary also notwithstanding, as to the first ten (10) Lots in each Section, provided that the Builder has deposited the Earnest Money with Developer for the respective Section, Developer shall be entitled to all remedies at law and in equity, including the right to pursue specific performance.

The Earnest Money otherwise shall be refunded or forfeited in accordance with the terms contained in this Agreement, and if all the terms and conditions of this Agreement are satisfied or waived and a transaction is closed, then the Earnest Money shall be applied as a One Thousand Dollar ($1,000) credit toward the purchase price as to each specific Lot as to which the transaction is closed.

When future sections are developed, Builder shall deposit Earnest Money in the amount of One Thousand Dollars ($1,000) per Lot when Developer notifies Builder, in writing, that all necessary and appropriate construction permits and plat approvals have been obtained. The said Earnest Money shall be applied as a credit in the same amount toward the purchase price of each such Lot.

{¶ 5} Section 4 of the 2004 contract required that Beazer "take down" at least two lots per month, and also provided:

If Builder fails to take down the required number of Lots in any single calendar month, Builder will stand in default, and upon *five (5) business days' written* notice thereof to Builder, *at the expiration of which Builder shall still have failed to take down the required number of Lots*, Developer may terminate this agreement and retain the balance of the Earnest Money as liquidated damages (and not as a penalty, since damages will be impossible to determine).

Notwithstanding the foregoing, Developer may require assurances from Builder at any reasonable time (and from time to time) as to Builder's readiness, willingness, and ability to perform under this Agreement. Builder's failure to *provide Developer with* assurances upon Developer's reasonable request within the reasonable time requested by Developer, and/or any breach by Builder, shall entitle Developer to retain the balance of the Earnest Money and, further, relieve Developer of any further obligation under this Agreement.

(Emphasis sic.)

{¶ 6} The 2004 contract also contained an integration clause:

14. Entire Agreement and Modification. This Agreement sets forth the entire and final agreement and understanding of the parties with respect to the subject matter hereof. Any and all prior agreements, understandings, or undertakings, whether written or oral, with respect to the same, are hereby superseded and replaced by this Agreement. This Agreement may not be modified or amended except by an instrument in writing, executed by each party.

{¶ 7} Both the 2000 contract and the 2004 contract contained provisions related to default and cure, nonwaiver, and notices as follows:

15. Cure and Default. Except as provided in section 4, no failure or default by either party hereto concerning any act required by it shall result in the termination of any right of either party hereunder until such party shall have failed to remedy such failure or cure such default within thirty (30) days after the receipt of written notice of the failure to [sic] default. Receipt shall be assumed upon the earlier of actual receipt or three (3) days after such notice is placed in the U.S. Mail, *properly addressed with postage prepaid.*

16. Non–Waiver. No waiver, forbearance, of [sic] failure by any party of its right to enforce any provision of this Agreement shall constitute a waiver or estoppel of such party's right to enforce such provision in the future.

17. Notices. All notices shall be in writing, and shall be deemed delivered when deposited in the U.S. Mail, addressed to the notices as follows:

**14**

Crossmann Communities, Inc.

dba Beazer Homes

Attn: Jeff Lodgson [sic, Logsdon]

929 Eastwind Drive, Suite 223

Westerville, Ohio 43081

Stonehenge Land Company

Attn: Mo M. Dioun

41 North High Street

New Albany, Ohio 43054

(Emphasis sic.)

{¶ 8} Following execution of the 2004 contract, Beazer deposited the $17,000 in earnest money and closed on 16 lots in Phase III, Section 1 of Elmont Place. On May 12, 2005, Stonehenge notified Beazer that all necessary construction permits and plan approvals had been obtained for Phase III, Section 2. It is undisputed that Beazer did not deposit any earnest money for Section 2, nor did it purchase any lots in Section 2.

{¶ 9} The evidence suggests that between May 12, 2005, and November 2, 2005, Beazer's legal counsel wrote several letters to Stonehenge indicating Beazer's position that it had no contractual obligation to purchase additional lots. Then, by letter dated November 2, 2005, Stonehenge's counsel sent a letter to Beazer's counsel, which stated:

Dear Mr. Dye:

This firm represents The Stonehenge Company ("Stonehenge"). We are responding to your letters to Mr. VanSlyck and Mr. Dioun regarding Crossman's [sic, Crossmann's] obligations under the Purchase Agreement (the "Agreement") for the Elmont Place Subdivision ("Elmont").

Under any reasonable interpretation of the Agreement, Crossman [sic, Crossmann] is in breach. The Agreement required Crossman [sic, Crossmann] to deposit one thousand dollars ($1,000) per lot in earnest money with Stonehenge when written notice is given that all necessary and appropriate construction permits and plat approvals have been obtained for Section 2 at Elmont. * * *

By letter dated May 12, 2005, Stonehenge gave written notice that all necessary construction permits and plot [sic] approvals for Section 2 at Elmont have been obtained. Despite Stonehenge's repeated demands for payment of earnest money, Crossman [sic, Crossmann] has failed to deposit the earnest money as required by the Agreement. Crossman's [sic, Crossmann's] failure to make the deposit of earnest money is a material breach of the Agreement.

\* \* \*

\* \* \* If I do not hear from you in five business days from the date of this letter, I will assume you have no interest in negotiating a resolution of this dispute, and we will proceed accordingly.

{¶ 10} On February 27, 2006, Stonehenge filed a complaint against Beazer, which stated causes of action for breach of the 2000 and 2004 contracts, intentional misrepresentation, and fraudulent inducement, and sought damages in excess of $300,000. The breach-of-contract claims included claims that Beazer breached its duty to purchase Phase III lots under both the 2000 and 2004 contracts and that it anticipatorily breached its duty to purchase Phase IV lots under both contracts.

{¶ 11} The parties filed cross-motions for summary judgment. With respect to the breach-of-contract claims, Beazer argued that it did not breach either contract, Stonehenge's claims were barred because it had not satisfied the condition precedent of properly serving a notice of default, and the liquidated-damages provision in the 2004 contract limited Stonehenge's damages to the amount of earnest money already deposited. Stonehenge argued that Beazer breached both the 2000 and 2004 contracts by failing to purchase certain lots in Phase III and any lots in Phase IV, and that Stonehenge is entitled to specific performance as a remedy for these breaches. With respect to the tort claims, Beazer argued that Stonehenge could not establish the element of justifiable reliance common to both claims, and Stonehenge argued that genuine issues of material fact existed with respect to that element.

{¶ 12} By decision and entry dated February 21, 2007, the trial court granted summary judgment in favor of Stonehenge on its claim for breach of its obligations to purchase Phase III lots under the 2004 contract. The court found that Stonehenge's failure to provide written notice of default, in accordance with the provisions for such notice set forth in the contract, was a "technical breach" of the notice provision, but that it was not a "material" breach. Therefore, the court reasoned, the failure to comply with the notice provision did not entitle Beazer to summary judgment on the breach-of-contract claims.

{¶ 13} The court found that Stonehenge is entitled to damages for breach of contract, but is not entitled to specific performance. This is because the 2004 contract only provides for specific performance as to any lots with respect to which Beazer had deposited earnest money but then failed to purchase. Since Beazer had purchased all lots for which it had deposited earnest money, specific performance was not available. The trial court further found that the liquidated-damages provision is ambiguous as to whether it provides merely for retention of earnest money already deposited or whether it also allows Stonehenge to recover monies that it expected Beazer would deposit for Phase III lots, but that never

were in fact deposited. Therefore, it determined that the jury would decide what the liquidated-damages provision meant.

{¶ 14} As to Beazer's obligation to purchase Phase IV lots, the court denied both parties' summary-judgment motions. The court recognized that the 2004 contract contains an integration clause, but noted that the 2000 contract concerns *all phases* of Elmont Place, whereas the 2004 contract only concerns Phase III. Therefore, the court determined that there remained a question for the jury whether the 2004 contract superseded the 2000 contract with respect to Phases III and IV, or whether it only superseded the 2000 contract with respect to Phase III. In other words, the jury was to determine whether Beazer's obligation to purchase Phase IV lots under the 2000 contract survived the parties' execution of the 2004 contract. Finally, the court denied both parties' motions for summary judgment with respect to the tort claims.

{¶ 15} Beazer made several motions in limine, including a motion to exclude any evidence as to the actual value of the Elmont Place lots, and other evidence as to Stonehenge's actual damages, arguing that the liquidated-damages clause precluded the jury's consideration of such evidence. The court denied the motion and allowed Stonehenge to introduce evidence of its actual damages.

{¶ 16} Following a four-day trial, the jury answered a series of interrogatories. The jury granted judgment in favor of Beazer on the fraudulent-inducement and intentional-misrepresentation claims. The jury determined that the 2004 contract "nullified," or superseded, the 2000 contract, with respect to Phase III lots, and that Beazer did not breach the 2000 contract when it failed to purchase Phase IV lots. Therefore, it granted judgment in favor of Beazer with respect to Stonehenge's claims for breach of the unsuperseded portion of the 2000 contract; that is, the claims based on Beazer's failure to purchase Phase IV lots. With respect to Stonehenge's claims for breach of the obligation to purchase Phase III lots under the 2004 contract (for which the trial court had already granted summary judgment to Stonehenge), the jury determined that the liquidated-damages provision does not limit Stonehenge's damages to earnest money already deposited. The jury awarded Stonehenge $359,522 in damages for breach of the 2004 contract, and $100,000 in attorney fees. Finally, the jury determined that Stonehenge had not made reasonable efforts to mitigate its damages and had incurred $45,960 in damages that it could have avoided by mitigating.

{¶ 17} After trial, Beazer moved the court for a judgment notwithstanding the verdict, pursuant to Civ.R. 50(B). Specifically, it argued that the jury's award of attorney fees was unsupported by the evidence because Stonehenge had offered no evidence as to the reasonableness of the fees. The trial court agreed and granted the motion. Beazer also moved the court for an award of attorney fees

expended in its successful defense of Stonehenge's claims under the 2000 contract, which the trial court denied.

{¶ 18} Each party filed a separate appeal, and we consolidated the appeals for decision. In its appeal, Beazer advances three assignments of error for our consideration, as follows:

Assignment of Error Number One

The Trial Court erred in granting Appellee's Motion for Summary Judgment because Appellant was not given a contractually required notice of default and opportunity to cure.

Assignment of Error Number Two

The Trial Court erred by submitting the issue of Appellee's actual damages to the jury when the Court had already determined that there was a clear and unambiguous contract provision for liquidated damages.

Assignment of Error Number Three

The Trial Court erred by denying Appellant's motion for an award of attorneys' fees, to which Appellant was entitled pursuant to the terms of the 2000 Purchase Agreement.

{¶ 19} In its appeal, Stonehenge advances the following assignments of error for our review:

Assignment of Error No. 1: The Trial Court erred by granting Beazer's Motion for Judgment Notwithstanding the Verdict and vacating the jury award of attorney's fees.

Assignment of Error No. 2: The Trial Court erred by denying Stonehenge an award of prejudgment interest.

Assignment of Error No. 3: The Trial Court erred by failing to order a posttrial hearing to allow Stonehenge to present complete evidence of its attorneys fees.

{¶ 20} We begin with Beazer's first assignment of error, in which Beazer argues that the trial court erred in concluding that Stonehenge's breach-of-contract claim was not barred by Stonehenge's failure to provide notice of default and an opportunity to cure, according to the specific procedure set forth in the 2004 contract. The contract provided that no failure or default by any party results in termination of any right under the contract until the party shall have failed to cure the default within 30 days after receipt of written notice of the failure or default, and that any such written notices were to be sent via U.S. Mail to Stonehenge in care of employee Jeff Logsdon. See ¶ 7, supra.

{¶ 21} The trial court found that the letter dated November 2, 2005, from Stonehenge's attorney to Beazer's attorney, constituted sufficient notice of default

and of Stonehenge's intent to declare a breach and to pursue its remedies under the contracts. The court determined that Stonehenge's failure to address the letter to Logsdon, at the address provided in the contracts, was a technical breach of the notice provision, but was not material or prejudicial. The court also found that Beazer had both actual notice of Stonehenge's declaration of default and intent to declare a breach, and an opportunity to cure.

{¶ 22} On appeal, Beazer argues that the trial court's determination undermined the purpose for which the notice provision was negotiated, which was to make the designated decision-maker, Logsdon, aware of circumstances in which Stonehenge believed Beazer to be in default and of how long Beazer had to decide whether or not to cure. The only case that Beazer cites in support of its position is the case of *Cummings v. Getz* (Feb. 11, 1985), Butler App. No. CA84-09-105, 1985 WL 8164, which does not support Beazer's argument.

{¶ 23} In *Cummings,* a former tenant sued her landlord for return of her security deposit, and the landlord asserted the affirmative defense that the tenant had not given the contractually required 30-day written notice of intent to vacate at the end of the lease term. The court of appeals held that, in the context of a residential lease, the purpose of requiring written notice of intent to vacate is to create certainty. However, the court determined that the tenant's failure to provide written notice of intent to vacate was immaterial because she had requested that the landlord allow her and her husband to terminate the lease before the expiration of the lease term, and he had advised her that she would have to wait until the end of the term. Thus, because the landlord had actual notice that the tenant intended not to renew her lease, her failure to comply with the notice terms was not a defense to the tenant's breach-of-contract action.

{¶ 24} Our research reveals support for the trial court's conclusion that where there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against a party that had actual notice. In *Interstate Gas Supply, Inc. v. Calex Corp.,* Franklin App. No. 04AP-980, 2006-Ohio-638, 2006 WL 328679, we held:

"The long and uniformly settled rule as to contracts requires only a substantial performance in order to recover upon such contract. Merely nominal, trifling, or technical departures are not sufficient to breach the contract." *Ohio Farmers' Ins. Co. v. Cochran* (1922), 104 Ohio St. 427, 135 N.E. 537, paragraph two of the syllabus. "A court should confine the application of the doctrine of substantial performance to cases where the party has made an honest or good faith effort to perform the terms of the contract." *Burlington Resources Oil & Gas Co. v. Cox* (1999), 133 Ohio App.3d 543, 548, 729 N.E.2d 398, citing *Ashley v. Henahan* (1897), 56 Ohio St. 559, 47 N.E. 573, paragraph one of the syllabus. "For the doctrine of substantial performance to apply, the part unperformed

must not destroy the value or purpose of the contract." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 148 Ohio App.3d 53, 2002-Ohio-198, 772 N.E.2d 138, at ¶ 12, citing *F.C. Mach. Tool & Design, Inc. v. Custom Design Technologies, Inc.* (Dec. 27, 2001), Stark App. No. 2001CA00019, 2001 WL 1673702, citing *Wengerd v. Martin* (May 6, 1998), Wayne App. No. 97CA0046 [1998 WL 225107]. Furthermore, "when the facts presented in a case are undisputed, whether they constitute performance or a breach of the contract, is question of law for the court." *Luntz v. Stern* (1939), 135 Ohio St. 225, 237, 20 N.E.2d 241.

Id. at ¶ 35.

■ {¶ 25} Stonehenge's attorney's letter to Beazer's attorney may have deviated from the contract's express terms as to where Stonehenge was required to send written notice of default and election to pursue contractual remedies for breach. However, under the facts and circumstances of this case, we cannot say that this technical deviation was sufficient to constitute breach of the 2004 contract that would relieve Beazer of liability for its breach. See, e.g., *Ohio Farmers' Ins. Co. v. Cochran* (1922), 104 Ohio St. 427, 135 N.E. 537, paragraph two of the syllabus (holding that merely nominal, trifling or technical departures are not sufficient to constitute breach of contract); see also *Roger J. Au & Son, Inc. v. Northeast Ohio Regional Sewer Dist.* (1986), 29 Ohio App.3d 284, 292, 29 OBR 349, 504 N.E.2d 1209 (stating that "[t]here is no reason to deny the claims for lack of written notice [if a party] was aware of [a disputed fact] and had a proper opportunity to investigate and act on its knowledge, as the purpose of the formal notice would thereby have been fulfilled").

■ {¶ 26} "A repudiation or other total breach by one party enables the other to get a judgment for damages or for restitution without performing acts that would otherwise have been conditions precedent." 5 Corbin on Contracts (1951) 920, 922, Section 977. On this principle, Ohio courts have concluded that the "renunciation of a contract by one of the parties constitutes a breach of contract which gives rise to a cause of action for damages, and in such a case notice, demand and tender are waived." *Loft v. Sibcy–Cline Realtors* (Dec. 13, 1989), Hamilton App. No. C–880446, 1989 WL 149667, *3. Here, Beazer repudiated the contract by failing and refusing to perform the obligations that went to the heart of the contract itself—the purchase of lots. Under those circumstances, Beazer cannot now insist that Stonehenge scrupulously adhere to every term of the contract. *Midwest Payment Sys., Inc. v. Citibank Fed. Sav. Bank* (S.D.Ohio 1992), 801 F.Supp. 9, 13.

{¶ 27} For all of the foregoing reasons, Beazer's first assignment of error is overruled.

{¶ 28} In support of its second assignment of error, Beazer contends that the trial court erred in determining that the liquidated-damages provision of the 2004 contract was ambiguous, and in submitting the issue of damages to the jury. The question of whether a contract is ambiguous is a question of law. *Wells v. C.J. Mahan Constr. Co.*, Franklin App. No. 05AP–180, 2006-Ohio-1831, 2006 WL 951444, ¶ 21, citing *Latina v. Woodpath Dev. Co.* (1991), 57 Ohio St.3d 212, 214, 567 N.E.2d 262. An appellate court reviews a trial court's resolution of legal issues de novo, without deference to the result that was reached by the trial court. *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949. A court should interpret a contract to give effect to the intention of the parties as manifested by the language of the contract. *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, paragraph one of the syllabus. When the terms of the contract are clear and unambiguous, courts may not create a new contract by finding intent not expressed by the terms. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 245–246, 7 O.O.3d 403, 374 N.E.2d 146.

{¶ 29} In this case, the liquidated-damages provision is contained within Section 2 of the 2004 contract and provides:

> Earnest Money Deposit. Upon execution of this Agreement, Builder shall deposit Seventeen Thousand Dollars ($17,000) (the Earnest Money) with Developer, to be held by Developer in trust upon and subject to the terms and conditions set forth herein.

> Builder shall forfeit the earnest money to Developer if Builder fails or refuses to perform its obligations herein specified. In such event, damages will be impossible to ascertain; therefore, such forfeiture of the Earnest Money shall constitute liquidated damages and not a penalty, and shall be Developer's sole remedy at law or in equity for a breach of any covenants or agreement of this Agreement to be performed or observed by Builder.

> Notwithstanding the foregoing, and any other provision of this Agreement to the contrary also notwithstanding, as to the first ten (10) Lots in each Section, provided that the Builder has deposited the Earnest Money with Developer for the respective Section, Developer shall be entitled to all remedies at law and in equity, including the right to pursue specific performance.

> The Earnest Money otherwise shall be refunded or forfeited in accordance with the terms contained in this Agreement, and if all the terms and conditions of this Agreement are satisfied or waived and a transaction is closed, then the Earnest Money shall be applied as a One Thousand Dollar ($1,000) credit toward the purchase price as to each specific Lot as to which the transaction is closed.

When future Sections are developed, Builder shall deposit Earnest Money in the amount of One Thousand Dollars ($1,000) per Lot when Developer notifies Builder, in writing, that all necessary and appropriate construction permits and plat approvals have been obtained. The said Earnest Money shall be applied as a credit in the same amount toward the purchase price of each such Lot. (Emphasis added.)

{¶ 30} The trial court concluded that the liquidated-damages provision was ambiguous as to whether it provides only for Stonehenge to keep any earnest money that Beazer had *already deposited*, or whether it also entitles Stonehenge to monies it *expected* would be deposited, but that Beazer never ultimately deposited. Contrary to the trial court's conclusion, we think that the language is clear and unambiguous.

{¶ 31} The liquidated-damages provision states, "Builder shall forfeit the earnest money to Developer if Builder fails or refuses to perform its obligations herein specified." Contract terms are to be given their plain and ordinary meaning. *Sharonville v. Am. Emp. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 6, citing *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167–168, 24 O.O.3d 274, 436 N.E.2d 1347. "Earnest money" is defined as "[a] deposit paid (often in escrow) by a prospective buyer (esp. of real estate) to show a good-faith intention to complete the transaction, and ordinarily forfeited if the buyer defaults." Black's Law Dictionary (8th Ed. 2004) 547. Because "earnest money" plainly refers to a "deposit paid" and does not refer to a deposit not yet paid, the liquidated-damages clause only encompasses those monies that Beazer had *already* deposited with Stonehenge prior to Beazer's breach. Therefore, the measure of Beazer's damages was readily ascertainable by reference to the language of the contract, and the trial court erred in submitting this issue to the jury instead of resolving the issue as a matter of law. The fact that the liquidated damages may be far less than Stonehenge's actual damages does not change this result. If the language of a contract is clear and unambiguous, courts must enforce the instrument as written. *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096.

{¶ 32} For all of the foregoing reasons, Beazer's second assignment of error is sustained.

{¶ 33} In support of its third assignment of error, Beazer argues that the trial court erred in denying Beazer's motion for attorney fees expended in its successful defense of Stonehenge's claim for breach of the 2000 contract vis-à-vis Phase IV lots. It directs our attention to a provision within the 2000 contract that states:

In the event a party hereto engages counsel to represent such party in connection with any breach or default, or threatened breach or default, hereof by the other party or to construe or enforce compliance with this Agreement, then the non-breaching or non-defaulting party and/or the party otherwise prevailing in any action to enforce or construe this Agreement, or any settlement associated therewith, shall be entitled to recover from the other all attorney fees, disbursements and costs to be incurred.

{¶ 34} Attorney fees are generally not recoverable in contract actions. *First Bank of Marietta v. L.C. Ltd.* (Dec. 28, 1999), Franklin App. No. 99AP–304, 1999 WL 1262058. Such a principle comports with the "American Rule" that requires each party involved in litigation to pay its own attorney fees in most circumstances. *Sorin v. Warrensville Hts. School Dist. Bd. of Edn.* (1976), 46 Ohio St.2d 177, 179, 75 O.O.2d 224, 347 N.E.2d 527. An exception to that rule allows for the recovery of attorney fees if the parties contract to shift fees. *McConnell v. Hunt Sports Ent.* (1999), 132 Ohio App.3d 657, 699, 725 N.E.2d 1193, citing *Pegan v. Crawmer* (1997), 79 Ohio St.3d 155, 156, 679 N.E.2d 1129.

{¶ 35} In denying Beazer's motion for attorney fees the trial court explained:
The jury returned a verdict in favor of [Beazer] on [Stonehenge's] breach of contract claim relating to the 2000 Purchase Agreement. The 2000 Purchase Agreement contained a provision stating that the non-breaching party in an action to enforce or interpret the 2000 Purchase Agreement is entitled to its reasonable attorney's fees. [Beazer] has moved the Court for an award of its attorney's fees, based on such verdict, and has requested a hearing to determine the reasonable amount thereof.
At trial, the Court determined that the question of whether an award of attorney's fees was to be made and if so the amount thereof, was to be submitted to the jury. * * * [Beazer] offered no evidence at trial from which a determination could be made of the amount or reasonableness of attorney's fees to be awarded to [Beazer], and as such the Court is incapable of making such an award.

{¶ 36} On appeal, Beazer argues that it did not have to present evidence at trial regarding its attorney fees expended in defense of Stonehenge's claim for breach of the 2000 contract, because its right to recover these fees only vested when the jury rendered a verdict in its favor on that claim. Beazer maintains that it would have been inappropriate and confusing to the jury if it had presented evidence as to its attorney fees at the same time it presented substantive evidence that it had not breached the 2000 contract.

{¶ 37} In response, Stonehenge presents two arguments, which we will address in turn. First, it points out that the jury answered "yes" to the interrogatory inquiring, "Was the 2000 Purchase Agreement, as amended in 2002, nullified by the 2004 Purchase Agreement?" Stonehenge argues that because the jury

determined that the 2000 contract had been "nullified," then the *entire contract,* including the attorney fees provision, is unenforceable.

{¶ 38} We note initially that the trial court did not rely on this interrogatory in denying Beazer's motion for attorney fees. More important, however, the record demonstrates that the jury did not determine that the *entire 2000 contract* had been nullified. The *only* issue before the jury respecting whether the 2004 contract nullified the 2000 contract was whether or not Beazer's 2000 contract obligation to purchase Phase IV lots survived the 2004 contract. Stonehenge claimed that Beazer had breached the 2000 contract by failing to purchase Phase IV lots, and Beazer's defense to that claim was that the 2004 contract superseded all terms in the 2000 contract that would have obligated Beazer to purchase Phase IV lots.[1] The jury interrogatory that Stonehenge cites does not even encompass whether the 2004 contract nullified the attorney fees provision, or other non-Phase IV lot purchase-related provisions; *the interrogatory only concerns whether the 2004 contract nullified Beazer's obligation to purchase Phase IV lots.* By its answer to the interrogatory, the jury indicated it found that Beazer's obligation under the 2000 contract to purchase Phase IV lots had been nullified by the parties' 2004 contract. The interrogatory does not mean that Beazer is not entitled to attorney fees under the 2000 contract; on the contrary, the interrogatory means that Beazer successfully defended itself against Stonehenge's claims that Beazer's obligation to purchase Phase IV lots survived the 2004 contract, and that Beazer had breached that obligation. Thus, under the 2000 contract, Beazer had a right to its reasonable attorney fees expended in defense of that claim.

---

1. {¶ a} Jury Instruction No. 10 states:

{¶ b} "Stonehenge also claims that Beazer breached the parties' contract with respect to Phase 4 of Elmont Place. Stonehenge also alleges that the 2004 Purchase Agreement was an amendment to the parties' contract that did not relieve Beazer of its obligations to buy the lots in Phase 4. According to Stonehenge, the subject matter of the 2004 Purchase Agreement was limited to Phase 3 of Elmont Place. Therefore, Stonehenge asserts that Beazer remained obligated pursuant to the 2000 Purchase Agreement, as amended in 2002, to purchase 10 lots in Phase 4. Stonehenge alleges that statements by Beazer that it would be making no further purchases of lots at Elmont Place constitutes an anticipatory breach of Beazer's contractual obligation to purchase the lots in Phase 4 of Elmont Place. * * *

{¶ c} "Beazer denies that it breached the contract with respect to Phase 4. Beazer contends that the terms of the 2000 Purchase Agreement, as amended in 2002, created no obligation on the part of Beazer to purchase, nor on the part of Stonehenge to sell, the Phase 4 lots. Rather, Beazer claims the parties intended only to establish the price at which such lots would be sold to Beazer, if Beazer wanted to purchase and Stonehenge wanted to sell those lots, if Stonehenge did not exercise its right to rezone Phase 4 for condominiums. Beazer also claims the 2004 Purchase Agreement superseded all terms of the 2000 Purchase Agreement, as amended in 2002, and that under the 2004 Purchase Agreement Beazer had no obligation to purchase lots in Phase 4.

{¶ d} *"You must decide whether the amended 2000 Purchase Agreement obligated Beazer to purchase Phase 4 lots."* (Emphasis added.)

{¶ 39} But Stonehenge also argues that the trial court correctly observed that Beazer was required to present evidence of its attorney fees at trial and that because Beazer failed to do so, the trial court correctly denied Beazer an award of fees or an opportunity to present evidence to the court. In reply, Beazer argues that requiring it to present evidence to the jury as to its attorney fees "had the legal effect of shifting to Beazer the burden of proof on a matter on which [Stonehenge] had such burden * * * [because evidence about Beazer's attorney fees was a matter] that the jury could not possibly have distinguished as being applicable to Beazer's case only." Beazer maintains that this, coupled with the fact that its right to attorney fees only "vested" upon the jury's verdict in its favor on Stonehenge's claim for breach of the 2000 contract, required that Beazer's claim for attorney fees be addressed not at trial but in a posttrial motion hearing.

{¶ 40} Beazer does not provide any authority for the proposition that a right to attorney fees under a contractual fee-shifting provision only vests upon the jury returning a verdict for the prevailing party. However, we note that this court has previously held that a plaintiff's right to *statutory* attorney fees did not vest until she received a judgment in her favor. *Pasco v. State Auto. Mut. Ins. Co.,* Franklin App. No. 04AP–696, 2005-Ohio-2387, 2005 WL 1155901, ¶ 20. In the case of *Keal v. Day,* 164 Ohio App.3d 21, 2005-Ohio-5551, 840 N.E.2d 1139, the First Appellate District held that for purposes of a contract providing for reasonable attorney fees for the "prevailing party" in any dispute over the contract, the term "prevailing party" means "one in whose favor the decision or verdict is rendered and judgment entered." Id. at ¶ 8.

{¶ 41} We are persuaded that Beazer did not acquire the right to attorney fees for its successful defense of Stonehenge's claim for breach of the 2000 contract until the jury rendered its verdict in Beazer's favor on this claim. Thus, it was not required to seek its reasonable attorney fees until that time. We note that Beazer moved for an award of attorney fees and a hearing on the issue merely three days after the jury rendered its verdict. Under these circumstances, we agree that the trial court erred in summarily denying Beazer's motion for a hearing on its request for attorney fees. Accordingly, we sustain Beazer's third assignment of error.

{¶ 42} We now move on to Stonehenge's appeal. Because they are interrelated, we will address Stonehenge's first and third assignments of error together. In its first assignment of error, Stonehenge argues that the trial court erred in granting Beazer's motion for judgment notwithstanding the verdict ("JNOV") and vacating the jury's award of attorney fees. In its third assignment of error, it maintains that the trial court should have allowed Stonehenge a posttrial hearing in order to submit additional evidence on the issue of attorney fees.

{¶ 43} A motion for JNOV should be granted when the trial court, construing the motion most strongly in favor of the nonmoving party, finds that upon any determinative issue, reasonable minds could come to but one conclusion upon the evidence submitted, and such conclusion is adverse to the nonmoving party. *Mantua Mfg. Co. v. Commerce Exchange Bank* (1996), 75 Ohio St.3d 1, 4, 661 N.E.2d 161. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon a motion for JNOV. *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 137, 17 OBR 281, 477 N.E.2d 1145, quoting *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334. "A motion * * * for judgment notwithstanding the verdict does not present factual issues, but a question of law, even though in deciding such a motion, it is necessary to review and consider the evidence." *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896. Thus, our review is de novo. *Hale v. Spitzer Dodge, Inc.*, Franklin App. No. 04AP–1379, 2006-Ohio-3309, 2006 WL 1781402, ¶ 15, citing *Miller v. Lindsay–Green, Inc.*, Franklin App. No. 04AP–848, 2005-Ohio-6366, 2005 WL 3220215, ¶ 52.

{¶ 44} The parties' 2004 contract provides that the nonbreaching and/or prevailing party in an action to enforce the contract "shall be entitled to recover from the other its reasonable attorney fees." The trial court granted Beazer's motion for JNOV as to the jury's award of attorney fees under the 2004 contract because, it found, Stonehenge had presented no evidence as to the reasonableness of its fees. Stonehenge argues that it presented evidence as to the reasonableness of its attorney fees through the testimony of its owner, Mr. Dioun, who testified that the fees Stonehenge seeks to recover are reasonable. Stonehenge also argues that Beazer never presented evidence that Stonehenge's fees were unreasonable. Stonehenge admits that it did not present "complete evidence of its attorney's fees," but argues this was because the trial court required it to present proof of its attorney fees during trial rather than at a posttrial hearing. It contends that the trial court should have held a separate posttrial hearing on attorney fees, but does not specify what other evidence would constitute "complete" evidence of its attorney fees.

{¶ 45} In response, Beazer points out that even though the 2004 contract provided that Stonehenge was *entitled* to its reasonable attorney fees by virtue of its status as a prevailing party, Stonehenge still had to prove that the amount it sought was in fact reasonable in the circumstances of this case. We agree. "A party seeking an award of attorney fees has the burden of demonstrating the reasonable value of such services." *DeHoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, Franklin App. No. 02AP–454, 2003-Ohio-3334, 2003 WL 21470388, ¶ 145; see also *Roth Produce Co. v. Scartz* (Dec. 27, 2001), Franklin App. No. 01AP–480, 2001 WL 1654555 ("A 'reasonable' fee must be related to the

work reasonably expended on the case and not merely to the amount of the judgment awarded").

{¶ 46} "In calculating attorney fee awards, we require that a number of factors be considered, including, among other things, the time and labor involved in maintaining the litigation, the novelty and difficulty of the questions presented, the professional skill required to perform the necessary legal services, the reputation of the attorney, and the results obtained." *Christe v. GMS Mgt. Co., Inc.* (2000), 88 Ohio St.3d 376, 378, 726 N.E.2d 497, citing *Bittner v. Tri–County Toyota, Inc.* (1991), 58 Ohio St.3d 143, 145–146, 569 N.E.2d 464. The factual determination of reasonableness must also be predicated upon an analysis of the hourly rates charged multiplied by the hours actually and necessarily spent, along with the aforementioned considerations of difficulty and complexity of the case, the attorney's reputation, and the results obtained. *Bittner.*

{¶ 47} In the present case, as Stonehenge concedes, the only evidence it presented as to its attorney fees was the testimony of Mr. Dioun. Mr. Dioun merely testified that his attorney fees were reasonable in his opinion and that the amount of fees that Stonehenge was requesting was consistent with what the attorneys estimated their fees would be for this litigation. But he did not know whether the hourly rates charged are typical for the market, which hourly rates were charged to Stonehenge, exactly who had worked on the case, or how much Stonehenge had actually been charged. He did not personally review Stonehenge's attorney invoices. This evidence is insufficient for the jury to determine the reasonableness of the attorney fees that Stonehenge seeks.

{¶ 48} Moreover, the trial court did not err in submitting the attorney-fee issue to the jury rather than holding a separate posttrial hearing on the matter. "Generally, attorney's fees are allowable as damages in breach of contract cases where the parties have bargained for a particular result and the breaching party's wrongful conduct led to the legal fees being incurred." *Natl. Eng. & Contracting Co. v. U.S. Fid. & Guar. Co.,* Franklin App. No. 03AP–435, 2004-Ohio-2503, 2004 WL 1103993, ¶ 23, citing *Westfield Cos. v. O.K.L. Can Line,* 155 Ohio App.3d 747, 2003-Ohio-7151, 804 N.E.2d 45. Because the attorney fees being sought herein were in the nature of damages, the trial court was required to submit the issue to the jury. "If the fees are damages, then the availability and amount of such fees have to be determined by the jury." *Christe,* 88 Ohio St.3d at 378, 726 N.E.2d 497, citing *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 557, 644 N.E.2d 397. Accordingly, the trial court correctly submitted the issue of Stonehenge's attorney fees to the jury, rather than holding a separate hearing on the issue.

{¶ 49} For all of the foregoing reasons, Stonehenge's first and third assignments of error are overruled.

{¶ 50} In its second assignment of error, Stonehenge argues that the trial court erred in the calculation of prejudgment interest. The trial court awarded prejudgment interest "only for the time period after the breach, and prior to the Court's entry of judgment herein, which was not already covered by Plaintiff's interest calculation at trial, i.e. from March 9, 2007 to the date of filing of this decision." Stonehenge argues that it was entitled to prejudgment interest on the jury's damage award from June 2005, at eight percent per annum, for a total of $43,141.53. In light of our disposition of Beazer's second assignment of error, which alters the amount of compensatory damages upon which any prejudgment interest calculation would be based, we find Stonehenge's second assignment of error to be moot, and we overrule it on that basis.

{¶ 51} In summary, we overrule Beazer's first assignment of error and sustain Beazer's second and third assignments of error; and we overrule Stonehenge's first and third assignments of error on their merits, and its second assignment of error as moot. We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and remand this cause to that court for further proceedings consistent with law and with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

PETREE and KLATT, JJ., concur.